No. 24-10612

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF UTAH; JEFFREY W. TORMEY; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION; TENNESSEE FIREARMS ASSOCIATION; VIRGINIA CITIZENS DEFENSE LEAGUE,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, in his official capacity as Attorney General of the United States; STEVEN DETTELBACH, in his official capacity as Director of Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MICHAEL S. RAAB
BRAD HINSHELWOOD
KEVIN KENNEDY
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties.  5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

The district court issued a preliminary injunction against a Bureau of Alcohol, Tobacco, Firearms and Explosives rule addressing when individuals are required to obtain a license to deal in firearms. The district court's standing analysis departs from two other district courts that denied preliminary injunctions against the same rule and adopts views of the federal licensing requirements that have been consistently rejected by this Court and others. The government believes that oral argument would assist the Court in resolving the case.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... v

STATEMENT OF JURISDICTION ......................................................................... 1

STATEMENT OF THE ISSUES ............................................................................. 1

STATEMENT OF THE CASE ................................................................................. 2

       A.    Statutory and Regulatory Background ......................................................... 2

       B.    Prior Proceedings .......................................................................................... 7

SUMMARY OF ARGUMENT ............................................................................... 9

STANDARD OF REVIEW ................................................................................... 12

ARGUMENT ......................................................................................................... 12

I.     Plaintiffs Lack Article III Standing ............................................................ 12

       A.    Tormey Has Not Alleged an Intent to Engage in Conduct
             Addressed by the Rule ................................................................................ 13

       B.    The Organizational Plaintiffs Lack Associational Standing ..................... 19

       C.    The States Cannot Establish Standing Based on Speculative and
             Attenuated Claims of Lost Tax Revenue .................................................. 25

II.    Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits ...... 33

       A.    Federal Law Does Not Set A Numerical Threshold for Firearms
             Sales or Transactions That Require a License ........................................... 34

       B.    Persons Dealing in Firearms Require a License Even If They Fail
             to Turn a Profit ........................................................................................... 38

       C.    The Rule's Understanding of "Personal Collection" Tracks the
             Statute ......................................................................................................... 41

D.      The Rule's Presumptions Do Not Shift the Burden of Proof in Any Proceeding ............................................................................45

III.    The Other Factors Weigh Against an Injunction ................................... 47

IV.     Relief Should Be Limited to the Offending Parts of the Rule and to the Injured Parties ......................................................................................... 48

CONCLUSION ....................................................................................................... 51

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                         **Page(s)**

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) ................................................................... 49

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ..................................................... 29

*Braidwood Mgmt., Inc. v. EEOC,*
    70 F.4th 914 (5th Cir. 2023) ......................................................18

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) ..................................................... 47

*Chemical Mfrs. Ass'n v. Department of Transp.,*
    105 F.3d 702 (D.C. Cir. 1997) ................................................. 46

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................... 13, 16, 25

*Cole v. USDA,*
    33 F.3d 1263 (11th Cir. 1994) .................................................. 46

*Do No Harm v. Pfizer Inc.,*
    96 F.4th 106 (2d Cir. 2024) ...................................................... 22

*Draper v. Healey,*
    827 F.3d 1 (1st Cir. 2016) ......................................................... 22

*El Paso County v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ......................... 9, 27, 28, 28-29, 29, 31, 32, 33

*Florida v. Mellon,*
    273 U.S. 12 (1927) ............................................................. 26, 27

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ........................................... 9, 25, 26, 28

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
    129 F.3d 826 (5th Cir. 1997) .................................................... 24

*Funeral Consumers All., Inc. v. Service Corp. Int'l,*
    695 F.3d 330 (5th Cir. 2012) ............................................. 23, 24

*Gill v. Whitford,*
   585 U.S. 48 (2018) ........................................................ 48

*Haaland v. Brackeen,*
   599 U.S. 244 (2023) ..................................................... 25

*Hancock County Board of Supervisors v. Ruhr,*
   487 F. App'x 189 (5th Cir. 2012) ................................. 22

*Huddleston v. United States,*
   415 U.S. 814 (1974) ................................................. 2, 44

*Iowa ex rel. Miller v. Block,*
   771 F.2d 347 (8th Cir. 1985) ...................................... 29

*Jiao v. Xu,*
   28 F.4th 591 (5th Cir. 2022) ....................................... 12

*John Doe #1 v. Veneman,*
   380 F.3d 807 (5th Cir. 2004) ...................................... 49

*Kansas v. Garland,*
   No. 2:24CV00088 JM, 2024 WL 2384611 (E.D. Ark. May 23, 2024) ..................... 26

*Kansas v. Garland,*
   No. 24-cv-01086-TC-TJJ, 2024 WL 3360533 (D. Kan. July 10, 2024) ................... 26

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ..................................................... 13

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ..................................................... 49

*MD/DC/DE Broads. Ass'n v. FCC,*
   236 F.3d 13 (D.C. Cir. 2001) ....................................... 49

*Moore v. Brown,*
   868 F.3d 398 (5th Cir. 2017) ...................................... 12

*Murthy v. Missouri,*
   144 S. Ct. 1972 (2024) ........................................ 9, 20, 25

*Nken v. Holder,*
   556 U.S. 418 (2009) ..................................................... 48

*NLRB v. Curtin Matheson Sci., Inc.,*
    494 U.S. 775 (1990) ................................................................................ 46

*OCA-Greater Hous. v. Texas,*
    867 F.3d 604 (5th Cir. 2017) ........................................................ 19, 23

*Pennsylvania ex rel. Shapp v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ............................................................ 29

*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022) ............................................................... 22

*Southwestern Elec. Power Co. v. U.S. EPA,*
    920 F.3d 999 (5th Cir. 2019) .............................................................. 49

*Speech First, Inc. v. Fenves,*
    979 F.3d 319, 330 (5th Cir. 2020) ..................................................... 22

*Speech First, Inc. v. Shrum,*
    92 F.4th 947 (10th Cir. 2024) ............................................................. 22

*State v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ................................................................. 8

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ............................................................................... 18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ............................................................................... 23

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................... 20

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ..................................................... 13, 15, 16, 18, 21

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ......................................................................... 12, 50

*United States v. Biswell,*
    406 U.S. 311 (1972) ......................................................................... 11, 48

*United States v. Carter,*
    801 F.2d 78 (2d Cir. 1986) .................................................................. 36

*United States v. Idarecis,*
 164 F.3d 620 (2d Cir. 1998) ............................................................43

*United States v. King,*
 735 F.3d 1098 (9th Cir. 2013) .................................................. 10, 36

*United States v. Nadirashvili,*
 655 F.3d 114 (2d Cir. 2011) ............................................................ 36

*United States v. Shipley,*
 546 F. App'x 450 (5th Cir. 2013) ............................................. 10, 39

*United States v. Swinton,*
 521 F.2d 1255 (10th Cir. 1975) ...................................................... 36

*United States v. Texas,*
 599 U.S. 670 (2023) ........................................................................ 27

*United States v. Tyson,*
 653 F.3d 192 (3d Cir. 2011) ............................................... 11, 39, 42

*United States v. Valdes,*
 681 F. App'x 874 (11th Cir. 2017) .................................................. 39

*United States v. Wilmoth,*
 636 F.2d 123 (5th Cir. Unit A Feb. 1981) ................................ 36, 39

*Viasat, Inc. v. FCC,*
 47 F.4th 769 (D.C. Cir. 2022) ........................................................ 24

*Washington v. U.S. Food & Drug Admin.,*
 108 F.4th 1163 (9th Cir. 2024) ....................................................... 29

*Winter v. Natural Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ........................................................................... 12

*Wyoming v. Oklahoma,*
 502 U.S. 437 (1992) .................................................................. 31, 32

*Wyoming v. U.S. Dep't of Interior,*
 674 F.3d 1220 (10th Cir. 2012) ...................................................... 29

*Ysleta Del Sur Pueblo v. Texas,*
 596 U.S. 685 (2022) ........................................................................ 44

*Zimmerman v. City of Austin*,
  881 F.3d 378 (5th Cir. 2018) ................................................................ 15, 21

**Statutes:**

Act of July 8, 1986,
  Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 ....................................... 40

Bipartisan Safer Communities Act,
  Pub. L. No. 117-159, 136 Stat. 1313 (2022) ............................................. 2

Firearms Owners' Protection Act,
  Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986) ............................... 3

Gun Control Act of 1968:
  18 U.S.C. § 921 *et seq.* ......................................................................... 2
  18 U.S.C. § 921(a)(13) ............................................................... 10, 42, 43
  18 U.S.C. § 921(a)(21)(C) ................................ 3, 6, 10, 14, 15, 34, 35, 38, 41
  18 U.S.C. § 921(a)(22) ...................................... 3, 6, 10, 35, 38, 39, 40
  18 U.S.C. § 922(a)(1)(A) ..................................................................... 1, 2
  18 U.S.C. § 922(b)(5) ............................................................................. 2
  18 U.S.C. § 922(t)(1) .............................................................................. 2
  18 U.S.C. § 923(g)(1)(A) ....................................................................... 2

28 U.S.C. § 1292(a)(1) .............................................................................. 1

28 U.S.C. § 1331 ....................................................................................... 1

**Regulations:**

27 C.F.R. § 478.11 .......................................................... 6, 11, 14, 41, 42, 49-50

27 C.F.R. § 478.13(a) .......................................................................... 14, 15

27 C.F.R. § 478.13(b) .......................................................................... 17, 37

27 C.F.R. § 478.13(c) ............................................................................. 5, 45

27 C.F.R. § 478.13(c)(1) ............................................................................ 47

27 C.F.R. § 478.13(c)(2) ............................................................................ 47

27 C.F.R. § 478.13(c)(2)(ii)(A) ................................................................... 4

27 C.F.R. § 478.13(d) ........................................................................... 40

27 C.F.R. § 478.13(d)(2) .................................................................. 4, 45

27 C.F.R. § 478.13(d)(2)(i) ................................................................. 46

27 C.F.R. § 478.13(d)(2)(ii) .................................................................. 4

27 C.F.R. § 478.13(e) ............................................................................ 4

27 C.F.R. § 478.13(g) ........................................................................... 5

27 C.F.R. § 478.13(h) ......................................................................... 45

27 C.F.R. § 478.57 .............................................................................. 45

27 C.F.R. §§ 478.121-478.134 ............................................................. 2

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ....................................................................1

**Other Authorities:**

ATF, *Do I Need A License to Buy and Sell Firearms?*,
   https://perma.cc/RX5R-7K47 (last updated May 2024) ............................................15

*Collection*, Merriam-Webster Online Dictionary,
   https://perma.cc/KXX7-ASLQ ...................................................................41

*Definition of "Engaged in the Business" as a Dealer in Firearms*,
   89 Fed. Reg. 28,968 (Apr. 19, 2024) ......................... 1, 3, 4, 5, 6, 7, 10, 11, 14, 15, 17,
                                                                           21, 30, 34, 36-37, 37, 38, 40, 41,
                                                                           42, 43, 44, 45, 46, 47, 48, 49, 50

## STATEMENT OF JURISDICTION

The district court entered a preliminary injunction on June 11, 2024. ROA.1010.  Defendants appealed on July 2.  ROA.1016; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit).  The district court had jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

For decades, persons "engage[d] in the business" of dealing in firearms have been required to obtain a license from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  18 U.S.C. § 922(a)(1)(A).  In 2022, Congress expanded the definition of "engaged in the business" to cover additional persons.  ATF subsequently promulgated the rule at issue here, which both implements the statutory change and addresses longstanding noncompliance issues by clarifying when a person is "engaged in the business" of dealing in firearms and setting forth examples of conduct that presumptively does, or does not, rise to the level of engaging in the business of dealing.  *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) (Rule).  The district court issued a preliminary injunction against the Rule, holding that plaintiffs have standing and that the Rule likely is unlawful because it is inconsistent with the statute.

The questions presented are:

1.  Whether plaintiffs have standing to challenge the Rule.

2.  Whether the Rule is arbitrary and capricious under the Administrative

Procedure Act (APA).

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

1.  To restrict the access of criminals and other dangerous individuals to

firearms, federal law has long imposed requirements on dealers of firearms, most

notably through the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.* (GCA).  *See*

*Huddleston v. United States*, 415 U.S. 814, 825 (1974).  Federal firearms licensees (FFLs)

must comply with various obligations when transferring firearms to non-licensees,

including submitting information about the transferee to the Federal Bureau of

Investigation's National Instant Criminal Background Check System (NICS), which

then conducts a background check on the transferee and prevents transactions where

the transferee is prohibited from receiving or possessing the firearm.  18 U.S.C.

§ 922(t)(1).  FFLs also maintain records of firearms transfers, enabling tracing of

firearms recovered from crime scenes.  *Id.* §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R.

§§ 478.121-478.134.

Since the GCA's enactment, Congress has required anyone "engage[d] in the

business" of dealing firearms to become an FFL.  18 U.S.C. § 922(a)(1)(A).  As most

recently amended by the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136

Stat. 1313 (2022) (BSCA), "engaged in the business" means "a person who devotes

time, attention, and labor to dealing in firearms as a regular course of trade or

2

business to predominantly earn a profit through the repetitive purchase and resale of firearms," while excluding anyone "who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). The GCA as amended defines "to predominantly earn a profit" to "mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(22). There is no requirement to prove that intent for persons who "engage[] in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.*

Congress added the definition of "to predominantly earn a profit" to the statute to broaden the category of individuals covered by the licensing requirement. Previously, the GCA required persons to be licensed if they had "the principal objective of livelihood and profit." *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986). There is thus no longer a requirement that "livelihood" be part of the intent in selling firearms; a predominant intent to "obtain[] pecuniary gain" is sufficient. 18 U.S.C. § 921(a)(22).

2. Even before the BSCA amendments, ATF observed significant noncompliance with the licensing requirements of the GCA. 89 Fed. Reg. at 29,086. After the BSCA amendments, ATF conducted the rulemaking at issue here to "implement" the BSCA's "statutory change" to the definition of engaged in the

3

business and to "provide clarity to persons who remain unsure of whether" they are engaged in the business of dealing in firearms.  *Id.* at 28,968.

The Rule does not require anyone to become an FFL of its own force.  Instead, relying on "conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business'" and ATF's enforcement experience, 89 Fed. Reg. at 28,977, the Rule identifies circumstances in which individuals are presumptively "engaged in the business" or likely have the requisite intent "to predominantly earn a profit," *id.* at 29,091; *see id.* at 28,977 nn.72-73, 28,978 nn.74-77, 79-80, 28,979 nn.81-83, 28,981-82, 28,981 nn.97-99, 28,982 nn.100-104 (collecting case law and examples of federal prosecutions), as well as circumstances in which individuals presumptively do not meet the statutory definition, *id.* at 29,092.

For example, a person is presumptively engaged in the business if he repetitively purchases stolen firearms for the purpose of resale, or resells or offers for resale stolen firearms. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(2)(ii)(A)). Similarly, a person presumptively has the requisite intent to earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms offered for resale.  *Id.* (27 C.F.R. § 478.13(d)(2)(ii)).  By contrast, a person "shall not be presumed" to be engaged in the business if they only resell or transfer firearms "[o]ccasionally to a licensee or to a family member for lawful purposes."  *Id.* at 29,092 (27 C.F.R. § 478.13(e)).  The Rule explains that the ultimate assessment will depend upon the totality of the circumstances: "neither the courts nor the Department have

4

recognized a set minimum number of firearms purchased or resold that triggers the licensing requirement." *Id.* at 28,976.

The Rule provides that the identified circumstances give rise to rebuttable presumptions in civil or administrative (but not criminal) proceedings. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c), (d)(2)). Within civil and administrative proceedings, the rebuttable presumptions "apply only to shift the burden of production, not the burden of persuasion." *Id.* at 29,007. Thus, "the rebuttable presumptions are merely evidentiary tools to assist the trier of fact in determining whether the Government has met its burden of production in a given proceeding." *Id.* Therefore, "[i]f evidence sufficient to support a presumption is produced in a civil or administrative proceeding, the responding person has the opportunity to produce reliable rebuttal evidence to refute that presumption." *Id.* at 29,026. And the Rule is clear that the activities set forth in the presumptions, and the examples of rebuttal evidence set out in the Rule, "are not exhaustive of the conduct or evidence that may be considered." *Id.* at 29,092 (27 C.F.R. § 478.13(g)).

To illustrate the point in concrete terms, if the government produces reliable evidence in an administrative proceeding that a person repetitively purchases stolen firearms for the purpose of resale, that evidence would give rise to a presumption in that proceeding that the person is required to be licensed. The person would then bear the burden to produce reliable evidence showing that their conduct nevertheless does not require a license.

5

Two specific aspects of the Rule are particularly relevant here. First, the GCA's definition of "to predominantly earn a profit" turns on "the intent underlying the sale," namely that the seller "predominantly" intend to "obtain[ ] pecuniary gain." 18 U.S.C. § 921(a)(22). Consistent with that definition, Rule explains that "actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit through the repetitive purchase and resale of firearms that is required." 89 Fed. Reg. at 29,045. Thus, under the statute, it follows that "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." *Id.*

Second, the statutory definition of "engaged in the business" excludes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby" or sales of "all or part of [a] personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). Drawing on dictionary definitions and case law, the Rule defines the term "personal collection" to include "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)." 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11). The Rule further explains that firearms purchased "for the purpose of resale with the predominant

intent to earn a profit" or "accumulated primarily for personal protection" are not part of a "personal collection," though the Rule provides that nothing in it "shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use." *Id.*

### B.    Prior Proceedings

A group of nine plaintiffs—four States (Texas, Louisiana, Mississippi, and Utah), four firearms organizations (Gun Owners of America, Inc. (GOA), Gun Owners Foundation (GOF), Tennessee Firearms Association (TFA), and Virginia Citizens Defense League (VCDL)), and one individual (Jeffrey W. Tormey)—filed suit in the Northern District of Texas and sought a temporary restraining order or preliminary injunction.  ROA.19-21.  The complaint brought three claims that the Rule allegedly violates the APA and claims for violations of the Fifth Amendment's vagueness doctrine, the Second Amendment, the Fourth Amendment, and the separation of powers.  ROA.56-62.

The district court granted a temporary restraining order as to Texas and the individual and organizational plaintiffs, but excluding the other State plaintiffs on the ground that they had not adequately demonstrated standing.  ROA.754, 764.  After supplemental briefing on standing and an extension of the temporary restraining order, the district court granted a preliminary injunction against the entirety of the Rule as to all plaintiffs.  ROA.1010.  The district court first held that all the plaintiffs have standing: the States due to expected decreases in tax revenue stemming from

anticipated reductions in gun sales and related activity; the sole individual, Tormey, based on the risk that the federal government will rely on the Rule to bring an enforcement action against him and subject him to legal sanctions; and the organizations based on injuries to their members (Tormey and other unidentified members described in the declarations). ROA.994-1003.

The court then held that plaintiffs were likely to succeed on their APA claims. Specifically, the district court held that the Rule departed from the statute in three ways: by (1) stating that actual profit is not required to be "engaged in the business"; (2) stating that there is no minimum number of firearms sales necessary to be engaged in the business; and (3) stating that firearms primarily used for self-defense are excluded from the "personal collection" safe harbor. ROA1003-07. The district court also held that the presumptions were "problematic" because they "flip the statute on its head by requiring that firearm owners prove innocence rather than the government prove guilt" and some "conflict with the statutory text," repeating its analysis of the statutory conflicts. ROA.1007. On the other injunction factors, the court held that plaintiffs faced irreparable harm from forgoing lawful conduct for fear of civil and criminal enforcement action, and that the States faced an irreparable injury from lost revenue. ROA.1008-09. And the court believed that the balance of the equities necessarily favored plaintiffs because "[t]here is generally no public interest in the perpetuation of unlawful agency action." ROA.1009 (quoting *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)).

8

## SUMMARY OF ARGUMENT

Plaintiffs have failed to make a "clear showing" that they are "likely to establish each element of standing." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024). The sole individual plaintiff—Tormey—does not allege that he intends to engage in any conduct described in a presumption under the Rule, and on his allegations no license would be required. The organizational plaintiffs have chiefly put forward hearsay statements about what various unidentified members have purportedly told the organizations' leadership. That is no basis on which to enter extraordinary relief. And in any event, the hearsay plaintiffs provide likewise does not describe an intention to engage in any conduct arguably affected by the Rule, and thus cannot suffice for standing.

The plaintiff States cannot plausibly claim to be regulated by the Rule at all. They instead claim that the Rule might lead to a decrease in tax revenue from firearms sales or taxes levied on gun shows. This theory is "too speculative" and "too attenuated" to confer standing, *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024), and indeed this Court has already rejected an essentially identical claim that the "loss of general tax revenues as an indirect result of federal policy" is a cognizable injury. *El Paso County v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020).

The district court also erred in its assessment of the merits. The Rule tracks the statute and applicable case law in stating that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" and that "[e]ven a single

firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." 89 Fed. Reg. at 28,976, 29,021; *e.g.*, *United States v. King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013). The plain text of the statute instead examines whether a person has devoted "time, attention, and labor" to dealing in firearms with the predominant intent to "earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C); *id.* § 921(a)(22).

The Rule also correctly recognizes that "actual profit is not a requirement of the statute." 89 Fed. Reg. at 29,045. The statute defines the phrase "to predominantly earn a profit" to refer to "the intent underlying" a person's actions, regardless of whether the person has completed a sale or succeeded in turning a profit. 18 U.S.C. § 921(a)(22). Here, too, courts (including this one) have consistently rejected the district court's reading of the statute. *E.g.*, *United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) (per curiam).

The Rule also correctly recognizes that the term "personal collection" in the statute's exception to the licensing requirement for an individual making "occasional sales . . . for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms," 18 U.S.C. § 921(a)(21)(C), is limited to firearms "accumulated for study, comparison, exhibition . . . , or for a hobby," 89 Fed. Reg. at 29,090. That follows from the ordinary meaning of "collection" and is confirmed by other portions of the statute, which define a "collector" as someone who "acquires, holds, or disposes of" certain firearms, 18 U.S.C. § 921(a)(13), that are

"of special interest to collectors" for some reason other than their capacity "as offensive or defensive weapons," 27 C.F.R. § 478.11. The "personal collection" exception to the licensing requirement thus does not permit individuals to claim that every firearm they own—including those acquired "primarily for personal protection," 89 Fed. Reg. at 29,090—is part of a "personal collection" and thus ignore the licensing requirement that would otherwise attach, as case law likewise confirms. *See, e.g.*, *United States v. Tyson*, 653 F.3d 192, 202 (3d Cir. 2011).

The district court misconstrued the Rule in suggesting that it shifts the burden to "firearm owners" to "prove innocence." ROA.1007. The Rule is clear that its presumptions "shall not apply to any criminal case," 89 Fed. Reg. at 29,092, and that even in civil and administrative proceedings the presumptions affect only "the burden of production, not the burden of persuasion," *id.* at 29,007.

The equities likewise do not favor a preliminary injunction. Plaintiffs' claims of irreparable harm overlap substantially with their claims to standing, and fail for largely the same reasons. On the other hand, regulating "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime," *United States v. Biswell*, 406 U.S. 311, 315 (1972), and the district court's injunction undermines those efforts. And at a minimum, the district court's injunction should be narrowed to apply only to those parts of the Rule actually at issue and only to those plaintiffs who have actually established standing.

## STANDARD OF REVIEW

This Court "review[s] the grant of a preliminary injunction for abuse of discretion." *Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022).  "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017) (per curiam).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The movant must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20.  Plaintiffs have failed to carry their burden with respect to any of these factors.

## I.    Plaintiffs Lack Article III Standing

"The law of Art. III standing is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021).  "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes" and "do not exercise general legal oversight of the Legislative and Executive Branches." *Id.* at 423-24.  Instead, to establish standing, a plaintiff must prove (1) that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) that the injury is "fairly traceable to the challenged action of the defendant, and not the

result of the independent action of some third party not before the court," and (3)

that it is "likely, as opposed to merely speculative, that the injury will be redressed by a

favorable [judicial] decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)

(cleaned up).  The district court erred in concluding that these requirements were

satisfied here.

> ### A.    Tormey Has Not Alleged an Intent to Engage in Conduct Addressed by the Rule

1.  Only one named plaintiff—Tormey—suggests that the Rule may someday

apply to him.  Tormey "fears" that, on account of the Rule, he will be "subject to"

ATF enforcement actions.  ROA.21.  To establish standing to challenge the potential

future enforcement of a statute or regulation, a plaintiff must show "an intention to

engage in a course of conduct" that is "arguably proscribed" by that statute or

regulation, and that "the threat of future enforcement . . . is substantial." *Susan B.

Anthony List v. Driehaus*, 573 U.S. 149, 161-164 (2014).  Mere "subjective fear," *Clapper

v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013), or "wholly speculative" possibilities of

future application, *Susan B. Anthony List*, 573 U.S. at 160, do not suffice.

Tormey has not stated an intent to engage in conduct that would require

obtaining a license to sell firearms.  Tormey's first declaration says he is "a collector

and a hobbyist" who engages in multiple shooting-related hobbies, "including

recreation, competitive shooting, hunting, and training," and who has sold "at least a

couple, or even several, firearms per year . . . in order to enhance the collection of

firearms that [he] own[s]. ROA.457-58. Tormey's stated purpose, in conducting

occasional sales, is to "enhance the collection of firearms that [he] own[s]."

ROA.457-58.

That conduct does not require Tormey to obtain a license. As the statute

makes clear, "a person who makes occasional sales, exchanges, or purchases of

firearms for the enhancement of a personal collection or for a hobby" is not required

to obtain a license. 18 U.S.C. § 921(a)(21)(C). The Rule repeats the statutory language

verbatim on this point, *see* 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)), and further

explains that the personal collection exception applies where firearms are

"accumulate[d] for study, comparison, exhibition . . . , or for a hobby (*e.g.*,

noncommercial, recreational activities for personal enjoyment, such as hunting, skeet,

target, or competition shooting, historical re-enactment, or noncommercial firearms

safety instruction)," *id.* at 29,090 (27 C.F.R. § 478.11). Tormey thus has no obligation

to obtain a license—and faces no prospect of enforcement—based on the conduct he

describes as a "collector and a hobbyist." ROA.457-58.

In a subsequent declaration, Tormey asserted that he owns certain "self-

defense firearms" that ATF would not regard as part of a "personal collection," and

that he "ha[s] sold firearms and in the future plan[s] to sell" such firearms to "upgrade

and enhance" those weapons, including describing a recent sale of a "revolver that

[he] owned for at least five years" and generally referring to instances where he

decided a particular firearm purchased for personal carry "was not for [him]" and thus

"sold it." ROA.789. That conduct likewise does not require Tormey to obtain a license. Tormey nowhere alleges that he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business," as required under the statute and repeated in the Rule. 18 U.S.C. § 921(a)(21)(C); 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)). Nor does Tormey contend that he makes such sales with the predominant intent to "earn a profit"—again, a necessary threshold requirement for needing a license under the statute that is parroted by the Rule. 18 U.S.C. § 921(a)(21)(C); 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)).[1]

Tormey has thus not alleged a "serious intention to engage in conduct proscribed by law" as necessary to establish standing to sue. *Zimmerman v. City of Austin,* 881 F.3d 378, 389 (5th Cir. 2018). Neither the statute nor the Rule requires Tormey to obtain a license to engage in the activity he describes, and it is telling that Tormey has not identified any presumption under the Rule that he believes his conduct could plausibly fall within. Any fear of future application is thus entirely "speculative." *Susan B. Anthony List*, 573 U.S. at 160, 163.

---

[1] Moreover, ATF has published guidance to help members of the public understand whether they are engaged in the business of dealing firearms under federal law. *See* ATF, *Do I Need A License to Buy and Sell Firearms?*, https://perma.cc/RX5R-7K47 (last updated May 2024). ATF's guidance explains that "nothing" in the Rule "precludes a person from lawfully acquiring firearms for self-protection or other lawful personal use, *or making isolated sales of such firearms* without devoting time, attention, and labor to dealing in firearms as a regular course of trade or business." *Id.* at 32 (emphasis added).

For much the same reason, Tormey's declarations also fail to show that the "threat of future enforcement" of the Rule against him "is substantial." *Susan B. Anthony List*, 573 U.S. at 164. Tormey has at most provided subjective concerns about what the Rule "seems to indicate," ROA.788, 789, or invoked "fear" about the "vague threats" of the Rule, ROA.458. As discussed, however, the Rule poses no "threat" to the activities Tormey describes, and in any event Tormey "cannot manufacture standing" through such a "subjective fear" of "hypothetical future harm" that is far from "certainly impending." *Clapper*, 568 U.S. at 416, 418.

2. The district court did not dispute that Tormey's sales related to a hobby or personal collection, as described in his first declaration, would not implicate the Rule at all. Nor did the district court identify any indication in Tormey's declarations that he had the requisite intent to earn a profit from any sale, much less that Tormey was engaged in "dealing in firearms as a regular course of trade or business." ROA.997. The court instead focused on its conclusion that a minimum number of firearms sales was required to require licensing under the statute, and that the Rule therefore departed from the statute by indicating that "a person can be engaged in the business of dealing without necessarily having completed multiple firearms sales," ROA.998; *see* ROA.1004-05. While the district court's statutory analysis was mistaken, *see infra* pp. 34-38, the dispute it identified has no bearing on Tormey's standing. First, insofar as the district court appeared to believe that the Rule departs from the statute by making every sale trigger the licensing requirement, that was mistaken from the face of the

Rule: the Rule is clear that "a single isolated firearm transaction" does not "require a license" of its own force; a single transaction would indicate the need for a license only "when combined with other evidence" demonstrating that the seller's conduct rose to the level of being engaged in the business. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(b)). Neither Tormey nor the district court identified anything in Tormey's declarations providing any "other evidence" showing that a single sale could even potentially be treated as triggering the licensing requirement. Indeed, as noted above, Tormey has alleged that he engaged in *multiple* sales, and nevertheless neither the statute nor the Rule requires that Tormey obtain a license.

In addition, even aside from that error, Tormey still has not alleged any intent to profit, as would be required to obtain a license. The district court did not identify any way in which the conduct Tormey describes would implicate anything the Rule says about when a person likely has the requisite intent to profit. Thus, even crediting the district court's plain misreading of the Rule, Tormey has not alleged an intent to engage in any conduct plausibly affected by the Rule.

Moreover, the district court was mistaken in concluding that Tormey faced a substantial risk that the Rule would be enforced against him, as separately required for standing. The Court held that a substantial threat of enforcement against Tormey existed given "a prior enforcement proceeding" discussed in another plaintiff's declaration. ROA.998-99. Courts have regarded prior enforcement as significant where past enforcement of a statute or regulation has occurred "against the same

17

conduct." *Susan B. Anthony List*, 573 U.S. at 164; *see Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding standing where the plaintiff challenged the "specific provisions of state law which have provided the basis for threats of" enforcement made by police). The only enforcement proceeding the district court identified was drawn from a second-hand description in a different plaintiff's declaration, and involved a criminal prosecution for unlawful dealing in firearms that predated the Rule by nearly a decade. ROA.998-99; *see* ROA.467-68. The declaration describes that criminal prosecution as involving an individual who relinquished an FFL, took the business's firearms into his personal inventory, and then sold those firearms without a license. ROA.467-68. Even crediting that untested description, a criminal prosecution alleging substantive liability under a statute has no probative value in showing whether a rule governing evidentiary burdens promulgated a decade later might be applied to Tormey in a civil or administrative proceeding, and likewise involves nothing resembling "the same conduct" Tormey alleges. *Susan B. Anthony List*, 573 U.S. at 164. And that is all the more true where, as discussed, Tormey's conduct does not constitute being "engaged in the business" of dealing firearms under the Rule's plain terms. *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023) (finding standing in the pre-enforcement challenge context where there was a prior enforcement action and the plaintiffs "admit[ted]" to "breaking" the guidance being challenged, an admission the government did "not seriously contest").

### B.    The Organizational Plaintiffs Lack Associational Standing

The organizational plaintiffs—GOA, GOF, TFA, and VCDL—contend that they possess standing to bring suit on behalf of their purported members.  An organization or association's claim to "'[a]ssociational standing' is derivative of the standing of the association's [or organization's] members." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).  Thus, where an organization's identified members lack standing—or the organization lacks members—the organization too lacks standing.

1.  GOA, TFA, and VCDL fail to identify a member with standing.  Those organizations principally attempt to ground their associational standing through the membership of Tormey.  But, for the reasons just discussed, Tormey lacks standing to challenge the Rule; he therefore cannot serve as the basis for associational standing for those organizations.

The organizations' efforts to derive their associational standing from other members is no more successful.  Even after receiving a temporary restraining order and being granted several weeks to obtain further declarations demonstrating standing, the organizations provided only declarations from leaders of the organizations that contain hearsay descriptions of conversations with certain unnamed members claiming to be impacted by the Rule.  *See* ROA.811 (GOA); ROA.797

(TFA); ROA.836 (VCDL).[2]  To establish standing, however, the organizations must "make specific allegations establishing that at least one *identified* member had suffered or would suffer harm" through "individual affidavits" establishing injury to those members; an organization's "self-description[] of [its] membership" cannot suffice. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009) (emphasis added).  Second-hand descriptions of the claims of unidentified members who have not themselves provided sworn declarations cannot suffice to make the requisite "clear showing" that plaintiffs are "likely to establish" this element of standing.  *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024).  And that requirement is especially important here, where plaintiffs purport to represent unnamed members and seek to preclude application of the Rule to individual proceedings to which those individuals might be subject.  The organizations do not allege that *every* member has standing, and in any event under plaintiffs' approach neither defendants nor the district court are aware (or could be aware) to whom any injunction would purportedly apply.

Moreover, even accepting these hearsay statements, none of them express an intent to engage in conduct that would require obtaining a license under the statute or the Rule.  GOA, for instance, describes one unnamed member who "[o]ccasionally . . . sells firearms from their collection in order to make room for new firearms or to replace firearms," ROA.811-12, which, as with Tormey, does not rise to being

---

[2] TFA appears to provide the last names of a few of its members, *see* ROA.798, but goes no further in identifying them.

"engaged in the business" of dealing firearms. Another unnamed GOA member purportedly "wishes to liquidate portions of" a "large collection of firearms" he inherited from a "late relative." ROA.813. But the Rule expressly provides that "liquidat[ing] firearms . . . [t]hat are inherited" is conduct that is *not presumed* to amount to being engaged in the business. 89 Fed. Reg. at 29,092. TFA's declarant, Richard Archie, states that he has sold firearms "from time to time in the past . . . with a view towards altering and improving my collection, and not for any commercial or business purpose." ROA.797. But as with Tormey, nothing about this description suggests that this conduct requires a license; to the extent Archie's sales involve a bona fide collection, they do not require a license, and Archie alleges no facts suggesting that he has a predominant intent to profit for any other sales or otherwise devotes time and energy to dealing in firearms as a course of trade or business. And Archie's declaration otherwise simply describes conversations with other TFA members who "intend to change or improve their personal collection" of firearms "through the future acquisition and disposition of firearms" without providing any other details suggesting that such conduct even remotely falls under the Rule's "engaged in the business" definition. ROA.797-98. Such vague assertions do not describe any "serious intention to engage in conduct proscribed by law." *Zimmerman*, 881 F.3d at 389. Furthermore, none of the organizations' unnamed members asserts that they are facing any imminent threat of an enforcement action pursuant to the Rule. *Susan B. Anthony List*, 573 U.S. at 161-64.

21

2.  The district court held that it was unnecessary for the organizations to actually identify a member because some courts have permitted organizations to proceed based on claims by anonymous or pseudonymous members.  ROA.1001-02. At the outset, this Court has not addressed whether such reliance is permissible,[3] and multiple courts of appeals have rejected the district court's view, emphasizing that an organization must provide the court with the name of a member with standing.  *See Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 115-19 (2d Cir. 2024); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016). But even the one court of appeals that has considered the question and permitted an organization to establish standing based on anonymous or pseudonymous members did so after reviewing declarations actually submitted by the pseudonymous members. *Speech First, Inc. v. Shrum*, 92 F.4th 947, 948-49 (10th Cir. 2024) ("Three members each submitted a pseudonymous declaration . . .").  Nothing remotely comparable occurred here: the only evidence of these unnamed members' purported injuries comes from hearsay statements in the declarations of others.

---

[3] The district court noted two cases from this Court that involved unnamed members of groups.  ROA.1002.  Neither case addressed the question here.  This Court's unpublished decision in *Hancock County Board of Supervisors v. Ruhr* addressed reliance on unnamed members at the *pleading* stage, not to support a preliminary injunction.  487 F. App'x 189, 198-99 (5th Cir. 2012).  And *Speech First, Inc. v. Fenves* is clear that the "only" dispute was about "whether it is likely that any of Speech First's members would have standing to sue in his own right" based on their conduct, 979 F.3d 319, 330 (5th Cir. 2020), and in any event relied on undisputed allegations by three particular members contained in the complaint to substantiate standing, *id.* at 326, 331.

3.  GOF adds one additional problem to those just explained: GOF lacks associational standing because it is not the sort of membership organization that can properly invoke such standing.  And even if it could, the non-member "supporter" it identifies lacks standing to sue in his own right.

GOF concedes that it is "not a traditional membership association."  ROA.824.  As this Court has explained, where an organization "seeking standing does not have traditional members," it must "establish[] its standing by proving that it has 'indicia of membership.'"  *Funeral Consumers All., Inc. v. Service Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012).  To do so, the organization must demonstrate that the non-members (1) "elect leadership," (2) "serve as the organization's leadership," and (3) "finance the organization's activities."  *Id.*  Only then are they "*effectively* members" capable of supporting a claim to associational standing.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 200 (2023).  GOF does not contend that its supporters elect its leadership or serve in those leadership positions, or indeed exert any formal control over the GOF's activities.  As a result, GOF's supporters are neither traditional members nor effectively members.

But even assuming that GOF's supporters satisfied the indicia-of-membership test, GOF's claim to associational standing remains "derivative" of those supporters, *OCA Greater Hous.*, 867 F.3d at 610, and that derivative claim fails because GOF has not identified a member with standing to sue.  GOF's declarations describe, but do not name or include a declaration from, a non-declarant "supporter" who reviews

23

firearms and posts the reviews on his YouTube channel, and then "sell[s] various firearms after reviewing them." ROA.817-18. But the declaration does not identify any way in which that conduct would fall within one of the presumptions established by the Rule.

The district court held that GOF's supporters possessed sufficient indicia of membership simply because GOF receives funding from its supporters and those supporters "regularly communicate their views to GOF about issues on which GOF should focus." ROA.1001. Neither of GOF's declarations states that "supporters" communicate their preferences to GOF in any systematic or "regular[]" way, much less describes how that occurs. ROA.70-79, 810-18. And GOF has provided no evidence that the "supporters" who it claims to press claims on behalf of control the organization's activities in any meaningful way; GOF simply provides a "newsletter" with updates on its activities, ROA.818, and does not apparently grant "supporters" any voting rights or other forms of control. GOF cannot establish standing where its supporters exercise no meaningful control over the organization, such as by "elect[ing] the governing body of the organization," *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997); *Funeral Consumers All.*, 695 F.3d at 344 n.9 (similar), or otherwise "guid[ing] its activities," *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022).

### C.    The States Cannot Establish Standing Based on Speculative and Attenuated Claims of Lost Tax Revenue

The States do not allege that they will ever or could ever be subject to a civil or administrative proceeding where the Rule might apply, or that they have standing on the basis of injuries suffered by their citizens.  *See Haaland v. Brackeen*, 599 U.S. 244, 294 (2023) (A "State does not have standing as *parens patriae* to bring an action against the Federal Government."  Instead, they assert various speculative economic theories of injury as a result of the Rule's anticipated impact on firearms sales.

At the outset, those theories of economic injury depend entirely on the actions of third parties.  Reliance on third-party actions makes standing "substantially more difficult to establish."  *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024); *accord Murthy*, 144 S. Ct. at 1986.  Plaintiffs cannot "rely on speculation about 'the unfettered choices made by independent actors not before the court.'"  *Clapper*, 568 U.S. at 414 n.5.  Moreover, their showing of causation "must not be too speculative or too attenuated," an inquiry examining both whether the reactions of third parties are "sufficiently predictable" and whether "the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing."  *Alliance for Hippocratic Med.*, 602 U.S. at 383.  And changes in behavior attributable to the BSCA's broadening of the statutory definition are not traceable to the Rule; the injury must flow from some way in which the Rule purportedly differs from the requirements of the statute.

1.  Each State alleges injury in the form of reduced tax revenue from the Rule's anticipated follow-on effects on economic activity.  The theory appears to have two strands.  Each State suggests that the Rule will make individuals less likely to sell guns, leading to fewer overall firearms sales, and thus reducing the sales tax collected on private sales of firearms.  ROA.859-60 (Texas); ROA.845-46 (Louisiana); ROA884-85 (Mississippi); ROA.927-28 (Utah).  Texas also suggests that the Rule will make individuals less likely to attend gun shows, thus leading to a decrease in "consumer traffic and activity" that occurs at or in relation to those gun shows, and causing an ensuing reduction in "motor fuels taxes, entertainment taxes, alcoholic beverage taxes, and hotel taxes."  ROA.860.  Each of those alleged injuries is both "too attenuated" and "too speculative" to confer standing, *Alliance for Hippocratic Med.*, 602 U.S. at 383—the conclusion reached by two other district courts presented with essentially identical allegations of standing in another challenge to the Rule at issue here.  *Kansas v. Garland*, No. 24-cv-01086-TC-TJJ, 2024 WL 3360533, at *5 (D. Kan. July 10, 2024); *Kansas v. Garland*, No. 2:24CV00088 JM, 2024 WL 2384611, at *2 (E.D. Ark. May 23, 2024).

The Supreme Court long ago explained that a State may sue the federal government only if it has suffered a "direct," rather than indirect or attenuated, injury from federal action.  *Florida v. Mellon*, 273 U.S. 12, 18 (1927).  In *Mellon*, Florida challenged the constitutionality of a federal inheritance tax, and it argued that the tax would cause the State financial harm by "inducing potential taxpayers to withdraw

26

property" and diminishing its tax base. *Id.* at 17-18. But the Court rejected that theory of standing, explaining that any harm caused by the tax was "purely speculative, and, at most, only remote and indirect." *Id.* at 18. The Court reiterated this same principle just last year when it observed that because "federal policies frequently generate indirect effects on state revenues or state spending," when a State "asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

This Court, too, has rejected standing premised on a "loss of general tax revenues as an indirect result of federal policy." *El Paso County v. Trump.*, 982 F.3d 332, 339 (5th Cir. 2020). In *El Paso County*, the plaintiff county challenged the Department of Defense's reallocation of $20 million in federal funds to build a wall at the United States-Mexico border, a sum that had originally been earmarked for a construction project at a local military base. *Id.* at 337-38. And the county based its standing on the "economic injury" and attendant "loss of general tax revenues" caused by the cancellation of the military base project. *Id.* at 338-39. More specifically, the county claimed that the project's cancellation would reduce its tax revenues because "a $20 million construction project within the county would necessarily generate taxes through workers staying at hotels, buying supplies, and spending money at local establishments." *Id.* at 338. But this Court concluded that

such "incidental and attenuated harm" to "general tax revenue" was "insufficient to grant a state or county standing." *Id.* at 341.

The revenue-related harms the States assert in this case cannot be meaningfully distinguished from the incidental revenue-related harms that were deemed inadequate to confer state standing in *El Paso County*. The States claim, at bottom, that the Rule will reduce certain types of economic activity in their respective States—specifically, sales of guns and other transactions and expenditures related to gun shows (compared to the various transactions and expenditures related to a local construction project at issue in *El Paso County*)—which will in turn cause a reduction in general tax revenues—specifically, sales taxes assessed on a variety of goods, including firearms sold at gun shows (compared to the local taxes assessed on hotel stays, supply purchases, and expenditures at local establishments in *El Paso County*). That is the very sort of "incidental economic impact" and reduction in "general tax revenues" that the *El Paso County* court deemed "inadequate" for state standing. 982 F.3d at 340.

The States' contrary view has no limit: because virtually everything the federal government does (or does not do) may have some downstream effect on state tax revenue, States would have standing to sue over virtually every federal policy. Nor would such theories be cabined to States: hotels or restaurants near a gun show would have the same downstream claim to standing. *See Alliance for Hippocratic Med.*, 602 U.S. at 391-92 (rejecting similar theories). Recognizing as much, this Court has noted that "federal policies will inevitably have an economic impact on local governments." *El*

*Paso County*, 982 F.3d at 340. Consequently, this Court explained, "[i]f every local government could sue to challenge any federal expenditure at a military base, the courts 'would cease to function as courts of law and would be cast in the role of general complaint bureaus.'" *Id.* at 341. The court thus concluded that Article III and Supreme Court precedent require government plaintiffs to demonstrate "more than an incidental economic impact" of a federal policy on "general tax revenues" to establish a cognizable injury in fact. *Id.* at 340-41.

Other courts of appeals have likewise rejected claims of state standing premised on the indirect effects of federal policy on state tax revenue or state expenditures. *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1175-76 (9th Cir. 2024); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022); *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 352-54 (8th Cir. 1985); *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672-73 (D.C. Cir. 1976). Those circuits, too, have recognized that claims based on the downstream effects of federal policy on state revenue would "make a mockery of the constitutional requirement of case or controversy," *Arizona*, 40 F.4th at 386 (alteration omitted), given "the unavoidable economic repercussions of virtually all federal policies," *Kleppe*, 533 F.2d at 672.

In addition to being attenuated, the States' theories of injury are also highly speculative. Texas asserts that "[u]nlicensed dealers exiting the market" in response to the Rule "will inevitably result in less gun sales, and thus less tax revenue collected by

the state[s]."  ROA.860.  The other States make similar claims.  ROA.860 ("Fewer gun sales in the state will result in less revenue from Louisiana's sales and use tax."); ROA.884 ("Mississippi will likely lose state sales-tax revenue collected from retail sales of firearms if the Final Rule takes effect."); ROA.927-28 (The Rule will "reduc[e] total gun sales at gun shows" and thus Utah "will sustain a financial loss").  But the crucial link in that theory—that some marginal number of fewer sellers means fewer sales—is not supported by record evidence or common sense.  The Rule predicts that a small proportion of currently "unlicensed persons who would be considered 'engaged in the business' under th[e] [R]ule" will be "unwilling or unable" to obtain a federal firearms license and "will instead choose to cease their dealing in firearms altogether."  89 Fed. Reg. at 29,072.  But even if the Rule slightly reduces the number of firearms sellers, that does not mean that the number of taxable firearms sales will decline: prospective buyers are just as likely to simply go to another source—including an FFL—to obtain a firearm, which would result in the same number of taxable sales.  *See id.* at 29,066 ("[T]he overall number of firearm transactions [is] unlikely to be significantly affected [by the Rule].").

Only Texas endeavors to put forth further evidence that the Rule will affect revenue related to gun shows, but that limited effort similarly highlights the speculative nature of the claims at issue and their reliance on independent decisions by third parties.  Texas points to a declaration from a gun show owner who asserts that he has experienced a "reduction in attendance, sales of tables, and people coming to

sell personal firearms" at his gun shows.  ROA.870.  Even assuming that could be

attributed to concern about regulation rather than economic or other factors, it is also

unclear whether any such change would be attributable to the Rule rather than to the

BSCA's expansion of the *statutory* definition to include individuals who do not intend

to earn a livelihood from dealing in firearms.  Furthermore, any reduction is a result

of independent decisions by third parties not before the Court—the Rule does not

mandate such a reduction in attendance or sales.  And even if some gun-show-related

tax revenues might decline, there is good reason to think that people who decide not

to attend a gun show will instead spend their discretionary income on other taxable

goods and services.  Any overall loss of tax revenues thus remains speculative, further

underscoring why courts have generally rejected standing based on the incidental

revenue effects of a federal policy.  *El Paso County*, 982 F.3d at 339.

2.  The district court held that the States had established standing based on the

prospect of reduced "sales and use taxes levied against firearms transactions" as well

as "motor fuels taxes, entertainment taxes, alcoholic beverages taxes, hotel taxes, and

more."  ROA.996.  That is indistinguishable from the injury based on lost "taxes

through workers staying at hotels, buying supplies, and spending money at local

establishments" that this Court rejected as too "incidental and attenuated" in *El Paso

County*.  982 F.3d at 338, 341.

*El Paso County* also disposes of the district court's reliance (ROA.996) on

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992).  There, Oklahoma coal power plants

31

purchased virtually all their coal from Wyoming mines, and the Supreme Court held
that Wyoming had standing to challenge the validity of an Oklahoma law requiring
Oklahoma power plants to "burn a mixture of coal containing at least 10%
Oklahoma-mined coal." *Id.* at 440, 443-44.  There was thus no question how third
parties—namely, Oklahoma power plants—would respond to the Oklahoma law, as
the law obligated them to reduce their purchases of out-of-state coal, and indeed the
undisputed record showed that Oklahoma adopted the regulation in question with the
avowed purpose of reducing purchases of coal from Wyoming and, by extension,
Wyoming's collection of a severance tax on that coal.  *Id.* at 443.  And the special
master presiding over the dispute specifically found that "the loss of any market" for
Wyoming coal in Oklahoma "cannot be made up by sales elsewhere, where
Wyoming's supply has already risen to meet demand." *Id.* at 446.

    As this Court explained in *El Paso County*, *Wyoming* involved unusual
circumstances where a State alleged "[a] direct link" to "the loss of a specific tax
revenue," 982 F.3d at 340: Wyoming lost tax revenue based on a targeted law that
solely addressed an activity not subject to substitution and for which the reaction of
third parties was not speculative.  As *Wyoming* itself recognized, that is different from
cases "den[ying] standing to States where the claim was that actions taken by United
States Government agencies had injured a State's economy and thereby caused a
decline in general tax revenues" because those cases did not "involve[] a direct injury
in the form of a loss of specific tax revenues."  502 U.S. at 448.

The district court apparently read *Wyoming*'s reference to "specific tax revenues" to require only that a plaintiff State identify a particular type of tax—such as a sales tax or income tax—that could be affected by the federal action. ROA.996 (emphasis omitted). That was the rationale endorsed by the dissent in *El Paso County*, which would have held that the county had standing based on its loss of "specifically the sales and income tax revenue related to" the cancelled federal project. 982 F.3d at 359 (Dennis, J., dissenting). And more generally, embracing the district court's theory would mean that *any* federal policy that affected *any* taxable activity would give rise to state standing so long as the State specified a particular type of tax it believed was affected, leading to precisely the limitless theory of standing this Court and others have consistently rejected and that *Wyoming* itself disclaimed.

## II.    Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

The Rule at issue here serves the important purpose of providing clarity about when persons are required to obtain a federal firearms license. It does so by describing conduct that courts and ATF have historically and regularly found to constitute being "engaged in the business" of dealing in firearms, even before the 2022 amendments to the BSCA broadened the relevant definition. And its primary effect is to provide for evidentiary presumptions in civil and administrative—not criminal—proceedings, such that conduct understood to constitute engaging in the

business of dealing in firearms in past cases will be understood as likely to constitute engaging in the business in future proceedings.

The district court held that plaintiffs had established a likelihood of success on the merits of their APA claim, holding that three aspects of the Rule are inconsistent with the underlying statute.  The district court was mistaken in all respects.

### A.    Federal Law Does Not Set A Numerical Threshold for Firearms Sales or Transactions That Require a License

The district court believed that the Rule departed from the statute in stating that there is no "minimum number of firearms to actually be sold to be 'engaged in the business" and that "[e]ven a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license."  ROA.1004 (emphasis omitted) (quoting 89 Fed. Reg. at 28,976, 29,021). That holding departed from the plain text of the statute and decades of uniform case law.

Federal law does not set a numerical threshold for the number of firearms a person must sell, or the number of transactions they must engage in, before they are required to obtain a federal firearms license.  Instead, a person is engaged in the business of dealing in firearms if they "devote[] time, attention, and labor" to dealing in firearms "to predominantly earn a profit through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C), and "'to predominantly earn a profit means that the *intent underlying* the sale or disposition of firearms is predominantly one of

obtaining pecuniary gain," *id.* § 921(a)(22) (emphasis added). The relevant question is thus whether a person has devoted effort as a regular course of trade or business to firearms transactions with the predominant purpose of profiting from repeated sales.

Because the licensing requirement focuses on a person's intent, it does not set a numerical threshold on the number of firearms a person must sell, or transactions they must complete, before they are required to obtain a license. That means that some individuals are not required to obtain a license even though they have engaged in multiple firearms transactions: as illustrated by plaintiff Tormey, multiple sales that lack the relevant predominant intent to earn a profit do not require a license. *See supra* pp. 13-18.

It also means that a person may have put forth effort to sell firearms with the requisite intent to profit—and thus require a license—even if they have not yet sold a firearm or have only sold one firearm. To take an easy example, a person who incorporates a gun store, purchases inventory for resale, rents a storefront to display the inventory, advertises the availability of guns at the store, and contracts with a payments processor to enable credit card payments is required to obtain a license before making a sale. In those circumstances, the individual undoubtedly has "devote[d] time, attention, and labor" to firearms dealing "as a regular course of trade or business" with the intent to "earn a profit through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C), regardless of whether they have actually made a sale.

35

Courts have recognized this principle for decades in a variety of factual contexts, explaining that while a single sale or offer to sell standing alone does not mean that a person is "engaged in the business," there is no "'magic number' of sales" that trigger the licensing requirement. *United States v. Carter*, 801 F.2d 78, 82 (2d Cir. 1986). Thus, while a single firearm sale "standing alone, without more," is generally not "sufficient to establish" that an individual is unlawfully dealing in firearms, "other facts and circumstances" in conjunction with that sale or offer may show that a person is "actively engaged in the business of dealing in guns." *United States v. Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975); *see United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A Feb. 1981) ("It is enough to prove that the accused has guns on hand or is ready and able to procure them for the purpose of selling them from time to time to such persons as might be accepted as customers."). For example, an individual who ordered 19 firearms, unsuccessfully attempted to sell one of them, and repeatedly told others he could procure guns for sale was engaged in the business, as the licensing requirement "does not require an actual sale of firearms." *United States v. King*, 735 F.3d 1098, 1106-07, 1107 n.8 (9th Cir. 2013); *accord United States v. Nadirashvili*, 655 F.3d 114, 120-21 (2d Cir. 2011).

The Rule straightforwardly implements this understanding of the statutory framework. The Rule explains that a "single isolated firearm transaction" may require a license only when "combined with other evidence (*e.g.*, where a person represents to others a willingness and ability to purchase more firearms for resale)." 89 Fed. Reg. at

29,091 (27 C.F.R. § 478.13(b)). And the Rule's preamble—relying on many of the cases cited above—explains that "a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license," while "an isolated firearm transaction would not require a license when other factors were not present." *Id.* at 28,976.

The district court did not engage with any of the case law cited in the Rule or addressed above. It did not cite any case adopting its interpretation of the statute in the decades since its enactment. Nor did the district court identify any actual threshold number of firearms or transactions it believed was necessary to trigger the licensing requirement. It simply noted that Section 921(a)(21)(C) uses various plural terms ("firearms") and terms contemplating an ongoing course of conduct ("repetitive"; "regular course"; "purchase and resale"), and from that concluded that the Rule was wrong to state that "'there is no minimum threshold number of firearms purchased *or* sold that triggers the licensing requirement.'" ROA.1004-05 (quoting 89 Fed. Reg. at 29,091). That ignores the intent component of the statute and the structure of the definition. A person (like the defendant in *King*) may have devoted energy to dealing in "firearms," and may have the requisite intent to profit from "the repetitive purchase and resale of firearms," even if they have not yet completed a sale. Indeed, on the district court's view, it is hard to see what purpose the intent requirement serves. The Rule, like the case law, instead properly understands the "repetitive purchase and resale of firearms" to describe how a person *intends* "to

predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C); *see also id.* § 921(a)(22) (defining "to predominantly earn a profit" in terms of "intent"); 89 Fed. Reg. at 28,977. Any businessperson can attest that putting effort into a business hoping to turn a profit through "the repetitive purchase and resale" of products is quite different from actually successfully engaging in such sales.

## B. Persons Dealing in Firearms Require a License Even If They Fail to Turn a Profit

The district court also held that the Rule departed from the statute in recognizing that "actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit through the repetitive purchase and resale of firearms that is required," and thus "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." ROA.1005 (emphasis omitted) (quoting 89 Fed. Reg. at 29,045).

That holding is mistaken for many of the same reasons as the district court's view of the threshold number of sales. The statute defines the phrase "to predominantly earn a profit" to refer to intent, not actual profit: "[t]he term 'to predominantly earn a profit' means that *the intent* underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to *other intents*, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22) (emphases added). And, consistent with that definition, the statute

eliminates the intent requirement for particular bad actors, noting that the "proof of profit" normally required—*i.e.*, proof of intent to profit—"shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.* And that understanding is reinforced by the statutory definition as a whole. As noted, the requirement to obtain a license may attach even before a sale has been consummated (and thus before any profit has been realized); the defendant in *King*, for example, could not avoid a conviction because he had not yet managed to earn a profit from a sale.

Even where sales have occurred, however, this Court has previously rejected the contention that "firearms transactions [that] actually caused [a defendant] to suffer a net loss" precluded a conviction for unlawful dealing in firearms, explaining that the statute requires that an individual intend to "mak[e] a profit, but it does not require that he succeeded in that endeavor." *United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) (per curiam); *see Wilmoth*, 636 F.2d at 125 (noting that the government "need not prove . . . that [a defendant] necessarily made a profit from dealing"). Other circuits have recognized the same principle. *E.g.*, *United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017) (per curiam) (citing *Wilmoth*, 636 F.2d at 125); *United States v. Tyson*, 653 F.3d 192, 200 (3d Cir. 2011) (observing that the statute refers to "profit" as the defendant's "motivation"). Indeed, were it otherwise, someone who is simply a bad businessman—like the defendant in *Shipley*—could sell unlimited firearms without any requirement to obtain a license.

39

Here, too, the district court did not engage with any of the cases rejecting its conclusion that actual profit is required under the statute. It instead focused solely on the text of the exception, which provides that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism," inferring from this language that actual profit must be required for other sales not "for criminal purposes or terrorism." ROA.1005 (emphases omitted) (quoting 18 U.S.C. § 921(a)(22)). This language has been part of federal law since 1986, *see* Act of July 8, 1986, Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766, and until the decision here no court has suggested that it means that an actual profit is required for other sales. That is because the sentence immediately preceding this exception makes clear that "intent" to profit determines whether a person engages in conduct "to predominantly earn a profit." 18 U.S.C. § 921(a)(22). The exception thus provides that someone who deals in firearms to arm a gang or terrorist organization is required to obtain a license—and can be prosecuted for unlicensed dealing—even if their predominant intent is to support terrorism or criminal activity rather than to profit. It does not add requirements to the definition of "to predominantly earn a profit," which exclusively addresses "the intent underlying the sale or disposition of firearms." *Id.* The Rule thus does not depart from the statute in any respect in recognizing that "actual profit is not a requirement of the statute." 89 Fed. Reg. at 29,045; *id.* at 29,091 (27 C.F.R. § 478.13(d)) ("[A]

person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms.").

### C.    The Rule's Understanding of "Personal Collection" Tracks the Statute

The GCA excludes from the licensing requirement "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). The district court held that the Rule departed from the statute in recognizing that not every firearm is part of a "personal collection" under the statute and explaining that the term does not include firearms "accumulated primarily for personal protection." 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11). That conclusion was likewise mistaken.

The term "personal collection" under the GCA does not necessarily refer to all firearms an individual owns, just as not everyone who owns cars has a "personal collection" of automobiles. Instead, the ordinary meaning of the term "collection" is "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby." 89 Fed. Reg. at 29,038 (quoting *Collection*, Merriam-Webster Online Dictionary, https://perma.cc/KXX7-ASLQ); *see id.* at 29,038 n.216. The Rule directly adopts this definition of "[p]ersonal collection": "Personal firearms that a person accumulates for study, comparison, exhibition . . . or for a hobby." *Id.* at 29,090 (27 C.F.R. § 478.11).

The ordinary meaning of the term is reinforced by comparison to other portions of the GCA.  Under the statute, a "collector" is a "person who acquires, holds, or disposes of firearms as curios or relics."  18 U.S.C. § 921(a)(13).  Congress granted the Attorney General authority to define "curios or relics," *id.*, and the relevant regulations have long defined the term as including "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended . . . as offensive or defensive weapons," such as firearms manufactured more than 50 years ago or that "derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event," 27 C.F.R. § 478.11.  As the Rule explains, a "'personal collection' . . . does not include firearms that have no special interest to the collector or hobbyist other than as weapons for self-defense or defense of others."  89 Fed. Reg. at 29,038.

Here, too, courts have consistently rejected arguments that all firearms a person owns are part of a "personal collection."  In *United States v. Tyson*, for example, the Third Circuit addressed a defendant who told others he was selling "'antique' guns" and described himself as a "firearms 'collector.'"  653 F.3d at 202.  The Third Circuit rejected those arguments, emphasizing that "none of the firearms purchased by [the defendant] were antiques."  *Id.*  Similarly, in *United States v. Idarecis*, the Second Circuit rejected arguments "that the definition of a gun 'collection' in § 921(a)(21)(c) should be read more broadly than the definition of a gun 'collector,'" emphasizing the

absence of "case authority to suggest that there is a distinction between the definition of a collector and of a collection in the statute." 164 F.3d 620, at *3-4 (2d Cir. 1998) (table).[4]

The district court looked to alternative definitions of "collection" that it read to be broader than the one adopted by the Rule, such as referring to simply "a gathering or assemblage of objects." ROA.1006. But the district court did not even acknowledge, much less address, the GCA's definition of "collector" in 18 U.S.C. § 921(a)(13) or the case law interpreting it, which plainly does not include unremarkable firearms acquired for self-defense. Thus, even assuming "collection" in isolation could sometimes carry a broader meaning than the one ascribed by the Rule, the GCA makes clear that the Rule's definition is correct.

The district court also invoked a policy concern—a purported "absurdity" that the personal-collection exclusion does not exempt persons who accumulate firearms primarily for personal protection, since that would mean many individuals would have "*no safe harbor at all*" from the licensing requirement. ROA.1006-07. It is unsurprising that Congress did not write the statute to exclude "the majority of gun owners" (ROA.1006-07) from the requirement to obtain a license if they engage in the business of dealing firearms; the requirement to obtain a license is a central feature of

---

[4] As the Rule notes, courts routinely draw the same distinction between firearms acquired as part of a "collection" and firearms acquired primarily for self-defense under the Sentencing Guidelines. 89 Fed. Reg. at 29,039 & n.219-221 (collecting cases).

Congress's regulation in this area. *See Huddleston v. United States*, 415 U.S. 814, 825 (1974) (explaining that the "the focus of the federal scheme is the federally licensed firearms dealer" to ensure that "weapons could not be obtained by individuals whose possession of them would be contrary to the public interest"); 89 Fed. Reg. at 29,038-39. The district court's apparent disagreement with that choice is not a reason to ignore the statute Congress wrote. *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 706 (2022) ("It is not [the court's] place to question whether Congress adopted the wisest or most workable policy, only to discern and apply the policy it did adopt.").

In any event, the district court's policy concern is based on mistaken premises. The "personal collection" exception provides that some conduct that would otherwise require a license—such as selling all or part of a personal collection of firearms, which could be a significant number—may nevertheless occur without a license. While firearms acquired primarily for personal protection do not fall within the personal collection *exclusion* from the definition of engaged in the business, that does not mean that sales of such firearms automatically require a license. Private sales of such firearms are permissible without a license so long as the seller's conduct does not rise to the level of being "engaged in the business." *See* 89 Fed. Reg. at 29,039 (noting that the definition does not mean that "individuals or companies cannot buy or sell firearms that are primarily for self-defense or protection of others," just that such "firearms are not necessarily part of a 'personal collection'").

**D.    The Rule's Presumptions Do Not Shift the Burden of Proof
in Any Proceeding**

As discussed above, the Rule looks to "conduct that the courts have found to
require a license even before the BSCA expanded the definition of 'engaged in the
business'" and ATF's enforcement experience, 89 Fed. Reg. at 28,977, to identify
circumstances in which individuals are presumptively "engaged in the business" or
presumptively have the requisite intent "to predominantly earn a profit," *id.* at 29,091;
*see id.* 28,977 nn.72-73, 28,978 nn.74-77, 79-80, 28,979 nn.81-83, 28,981-82, 28,981
nn.97-99, 28,982 nn.100-104 (collecting case law and examples of federal
prosecutions), as well as circumstances in which individuals likely do not meet the
statutory definition, *id.* at 29,092.  The Rule provides that the identified circumstances
give rise to rebuttable presumptions in civil or administrative (but not criminal)
proceedings.  *Id.* at 29,091 (27 C.F.R. § 478.13(c), (d)(2)).

The district court believed that these presumptions were problematic because
they "requir[e] that firearm owners prove innocence rather than the government
prove guilt." ROA.1007.  That ignores what the Rule actually says and does.  To
begin, "innocence" and "guilt" have nothing to do with it; the Rule is clear that the
presumptions "shall not apply to any criminal case," 89 Fed. Reg. at 29,092 (27 C.F.R.
§ 478.13(h)), a point the Rule's preamble reiterates no less than 10 times, *see id.* at
28,969, 28,976, 28,977, 28,982, 29,000, 29,007, 29,013, 29,014, 29,025, 29,027.

Even in the civil and administrative proceedings in which they apply, the presumptions do not shift "the burden of persuasion (also sometimes referred to as the burden of proof)." 89 Fed. Reg. at 29,007. They instead "apply only to shift the burden of production." *Id.* Thus, a presumption is only relevant if the government first introduces reliable evidence to show that the conditions of the presumption are met—for example, that an individual has "[r]epetitively or continuously advertise[d], market[ed], or otherwise promote[d] a firearms business," and thus should be presumed to have the intent to earn a profit through the repeated purchase and resale of firearms. *Id.* at 29,091 (27 C.F.R. § 478.13(d)(2)(i)); *see id.* at 29,026. The government's obligation to prove the relevant conduct thus does not change; the presumptions simply establish certain types of showings that will satisfy the government's burden and thus shift the burden of production to the respondent. *Id.* at 29,007-08. Such presumptions are not uncommon in such civil or administrative proceedings, recognizing circumstances where "proof of one fact renders the existence of another fact 'so probable that it is sensible and timesaving to assume the truth of [the inferred] fact.'" *Chemical Mfrs. Ass'n v. Department of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997) (quoting *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 788-89 (1990)); *Cole v. USDA*, 33 F.3d 1263, 1267 (11th Cir. 1994) ("The law is well established that presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts.").

46

Indeed, the district court—like plaintiffs—largely has not questioned the substance of the presumptions or their relevance to the statutory standard, and as noted, many of the presumptions are based on cases interpreting the statute, not "Department *ipse dixit*." ROA.1008 (quoting *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024)). The district court called into question just two presumptions, but doubted both based on the court's erroneous view—discussed above, *see supra* pp. 34-38—that the licensing requirement requires completed sales. ROA.1007 (questioning presumptions that refer to "a willingness and ability to purchase and resell" firearms and "[r]epetitively purchas[ing] for the purpose of resale, or repetitively resell[ing] or offer[ing] for resale" certain firearms, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(1), (2))). Those asserted conflicts add nothing to the district court's analysis.

## III.    The Other Factors Weigh Against an Injunction

The other injunctive factors likewise do not support the extraordinary relief of a preliminary injunction.

Plaintiffs' claims of irreparable harm largely overlap with their claims to standing, and the district court's assessment of those harms similarly tracks its erroneous assessment of standing and the merits, referring generally to "monetary costs" and potential "civil and criminal enforcement actions for engaging in conduct that the BSCA permits but the Final Rule impermissibly forbids." ROA.1009. As discussed, however, there is no prospect of *criminal* enforcement of the Rule at all, the

Rule in all respects tracks the statutory framework and longstanding case law interpreting the licensing requirement, and the Rule does not create new licensing requirements or require anyone to obtain a license of its own force.

As to the final two factors, the balance of the equities and public interest merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As noted, plaintiffs face no cognizable injury at all from the Rule, and many would face injury only in the event they were involved in some unspecified future administrative or civil proceeding. The government, on the other hand, has a strong interest in continuing to enforce the Rule. Regulating "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime." *United States v. Biswell*, 406 U.S. 311, 315 (1972). ATF nonetheless documented significant noncompliance with the licensing requirements of the GCA, even before the BSCA amendments. 89 Fed. Reg. at 29,086. The Rule here helps to promote compliance with those licensing requirements. Affirming the district court's grant of a preliminary injunction would thus undercut these efforts to reduce noncompliance.

## IV.    Relief Should Be Limited to the Offending Parts of the Rule and to the Injured Parties

If the Court were to conclude that a preliminary injunction is warranted, that relief should be no broader than necessary to remedy any demonstrated harms of the plaintiffs in this case. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should

be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). "The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

This Court should limit relief to the provisions or aspects held likely unlawful. The Rule contains a "[s]everability" section expressing ATF's intent that the Rule's provisions be severable to the maximum extent possible, such that if any aspect of the Rule is held unlawful, the remainder "shall not be affected and shall be construed so as to give them the maximum effect permitted by law." 89 Fed. Reg. at 29,070. Typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency *and* [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *accord Southwestern Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019). The Rule's severability section makes clear ATF's intentions with respect to severability. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

Despite the severability clause—and without conducting a severability analysis—the district court enjoined the entirety of the Rule, despite only addressing three definitions and two presumptions. The Rule, however, contains numerous other definitions and regulatory changes that continue to function without those pieces considered by the district court. *See, e.g.*, 89 Fed. Reg. at 29,090 (27 C.F.R.

49

§ 478.11) (defining, among other terms, "dealer," "purchase," "former licensee inventory"); *id.* at 29,092 (27 C.F.R. § 478.57) (adding provision pertaining to "Discontinuance of business").

Moreover, if any relief is warranted, it should be limited only to those plaintiffs who have actually established standing. *See, e.g.*, *TransUnion*, 594 U.S. at 431. That is particularly important as to the organizational plaintiffs, who purport to litigate on behalf of numerous unidentified members who do not control the litigation and may not even know about the litigation. Indeed, the identities of those members are not known to the district court or to defendants, who are currently enjoined from applying the Rule to "all Plaintiffs." ROA.1010. Even if those organizations can claim Article III standing to sue on behalf of these unidentified members, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. Such an approach would respect longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MICHAEL S. RAAB

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
KEVIN J. KENNEDY
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

September 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,973 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**ADDENDUM**

## TABLE OF CONTENTS

18 U.S.C. § 921 (excerpts) ...................................................................................A1

18 U.S.C. § 922 (excerpts) ...................................................................................A4

27 C.F.R. § 478.11 (excerpts) ..............................................................................A5

27 C.F.R. § 478.13 ................................................................................................A7

**18 U.S.C. § 921 (excerpts)**

**§ 921. Definitions**

**(a)** As used in this chapter—

…

    **(11)** The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

…

    **(13)** The term "collector" means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define, and the term "licensed collector" means any such person licensed under the provisions of this chapter.

…

    **(21)** The term "engaged in the business" means—

    **(A)** as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;

    **(B)** as applied to a manufacturer of ammunition, a person who devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition manufactured;

    **(C)** as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;

    **(D)** as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional

A1

repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms;

**(E)** as applied to an importer of firearms, a person who devotes time, attention, and labor to importing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms imported; and

**(F)** as applied to an importer of ammunition, a person who devotes time, attention, and labor to importing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition imported.

**(22)** The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which—

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended—

  **(i)** to intimidate or coerce a civilian population;

  **(ii)** to influence the policy of a government by intimidation or coercion; or

  **(iii)** to affect the conduct of a government by assassination or kidnapping.

**(23)** The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which—

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended—

  **(i)** to intimidate or coerce a civilian population;

  **(ii)** to influence the policy of a government by intimidation or coercion; or

  **(iii)** to affect the conduct of a government by assassination or kidnapping.

**18 U.S.C. § 922 (excerpts)**

**§ 922. Unlawful acts**

**(a)** It shall be unlawful—

    **(1)** for any person—

        **(A)** except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or

        **(B)** except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce;

        …

**27 C.F.R.§ 478.11 (excerpts)**

**§ 478.11. Meaning of terms.**

…

*Collector.* Any person who acquires, holds, or disposes of firearms as curios or relics.

…

*Curios or relics.* Firearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons. To be recognized as curios or relics, firearms must fall within one of the following categories:

**(a)** Firearms which were manufactured at least 50 years prior to the current date, but not including replicas thereof;

**(b)** Firearms which are certified by the curator of a municipal, State, or Federal museum which exhibits firearms to be curios or relics of museum interest; and

**(c)** Any other firearms which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event. Proof of qualification of a particular firearm under this category may be established by evidence of present value and evidence that like firearms are not available except as collector's items, or that the value of like firearms available in ordinary commercial channels is substantially less.

…

*Personal collection (or personal collection of firearms, or personal firearms collection)*—(1) *General definition.* Personal firearms that a person accumulates for study, comparison, exhibition (e.g., collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (e.g., noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (e.g., primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: Provided, that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.

…

*Principal objective of livelihood and profit.* The intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

**27 C.F.R.§ 478.13**

## § 478.13. Definition of "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker."

**(a) *Definition.*** A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. The term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms. In addition, the term shall not include an auctioneer who provides only auction services on commission to assist in liquidating firearms at an estate-type auction; provided, that the auctioneer does not purchase the firearms, or take possession of the firearms for sale on consignment.

**(b) *Fact-specific inquiry.*** Whether a person is engaged in the business as a dealer under paragraph (a) of this section is a fact-specific inquiry. Selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity. However, there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (e.g., where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas, a single isolated firearm transaction without such evidence would not require a license. At all times, the determination of whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances.

**(c) *Presumptions that a person is engaged in the business as a dealer.*** In civil and administrative proceedings, a person shall be presumed to be engaged in the business of dealing in firearms as defined in paragraph (a) of this section, absent reliable evidence to the contrary, when it is shown that the person—

**(1)** Resells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (i.e., to be a source of additional firearms for resale);

**(2)** Repetitively purchases for the purpose of resale, or repetitively resells or offers for resale, firearms—

**(i)** Through straw or sham businesses, or individual straw purchasers or sellers; or

**(ii)** That cannot lawfully be purchased, received, or possessed under Federal, State, local, or Tribal law, including:

**(A)** Stolen firearms (e.g., 18 U.S.C. 922(j));

**(B)** Firearms with the licensee's serial number removed, obliterated, or altered, or not identified as required by law (e.g., 18 U.S.C. 922(k) or 26 U.S.C. 5861(i));

**(C)** Firearms imported in violation of law (e.g., 18 U.S.C. 922(l), 22 U.S.C. 2778, or 26 U.S.C. 5844, 5861(k)); or

**(D)** Machineguns or other weapons defined as firearms under 26 U.S.C. 5845(b) that cannot lawfully be possessed (e.g., 18 U.S.C. 922(o); 26 U.S.C. 5861(d));

**(3)** Repetitively resells or offers for resale firearms—

**(i)** Within 30 days after the person purchased the firearms; or

**(ii)** Within one year after the person purchased the firearms if they are—

**(A)** New, or like new in their original packaging; or

**(B)** The same make and model, or variants thereof;

**(4)** As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale to a person (other than a licensee in accordance with § 478.57 or § 478.78) firearms that were in the business inventory of the former licensee at the time the license was terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license), whether or not such firearms were transferred to a responsible person of the former licensee after the license was terminated in accordance with § 478.57(b)(2) or § 478.78(b)(2); or

**(5)** As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale firearms that were transferred to the licensee's personal collection or otherwise as personal firearms in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a(a) prior to the time the license was terminated, unless:

**(i)** The firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by 18 U.S.C. chapter 44; and

**(ii)** One year has passed from the date of transfer to the licensee's personal collection or otherwise as personal firearms.

**(d)** ***Predominantly earn a profit***—(1) *Definition.* The intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, that proof of profit, including the intent to profit, shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this section, a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms.

**(2)** ***Presumptions that a person has intent to predominantly earn a profit.*** In civil and administrative proceedings, a person shall be presumed to have the intent to predominantly earn a profit through the repetitive purchase and resale of firearms as defined in paragraph (d)(1) of this section, absent reliable evidence to the contrary, when it is shown that the person—

**(i)** Repetitively or continuously advertises, markets, or otherwise promotes a firearms business (e.g., advertises or posts firearms for resale, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;

**(ii)** Repetitively or continuously purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms they offer for resale, including part or all of a business premises, a table or space at a gun show, or a display case;

**(iii)** Makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale;

**(iv)** Purchases or otherwise secures merchant services as a business (e.g., credit card transaction services, digital wallet for business) through which the person intends to repetitively accept payments for firearms transactions;

**(v)** Formally or informally purchases, hires, or otherwise secures business security services (e.g., a central station-monitored security system registered to a business, or guards for security) to protect firearms assets and repetitive firearms transactions;

**(vi)** Formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes, or offers to make, repetitive firearms transactions; or

**(vii)** Secures or applies for a State or local business license to purchase for resale or to resell merchandise that includes firearms.

**(e)** ***Conduct that does not support a presumption.*** A person shall not be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms—

**(1)** As bona fide gifts;

**(2)** Occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection;

**(3)** Occasionally to a licensee or to a family member for lawful purposes;

**(4)** To liquidate (without restocking) all or part of the person's personal collection; or

**(5)** To liquidate firearms—

**(i)** That are inherited; or

**(ii)** Pursuant to a court order; or

**(6)** To assist in liquidating firearms as an auctioneer when providing auction services on commission at an estate-type auction.

**(f)** ***Rebuttal evidence.*** Reliable evidence of the conduct set forth in paragraph (e) of this section may be used to rebut any presumption in paragraph (c) or (d)(2) of this section that a person is engaged in the business of dealing in firearms, or intends to predominantly earn a profit through the repetitive purchase and resale of firearms.

**(g)** ***Presumptions, conduct, and rebuttal evidence not exhaustive.*** The activities set forth in the rebuttable presumptions in paragraphs (c) and (d)(2) of this section, and the activities and rebuttal evidence set forth in paragraphs (e) and (f) of this section, are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms, or has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms.

**(h)** ***Criminal proceedings.*** The rebuttable presumptions in paragraphs (c) and (d)(2) of this section shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences.

A10