No. 24-10612

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF UTAH; JEFFREY W. TORMEY; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION; TENNESSEE FIREARMS ASSOCIATION; VIRGINIA CITIZENS DEFENSE LEAGUE,

*Plaintiffs - Appellees,*

*v.*

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, in his official capacity as Attorney General of the United States; STEVEN DETTELBACH, in his official capacity as Director of Bureau of Alcohol, Tobacco, Firearms and Explosives,

*Defendants - Appellants.*

On Appeal from the United States District Court for the Northern District of Texas

**BRIEF FOR AMICI CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE, MARCH FOR OUR LIVES, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF DEFENDANTS-APPELLANTS AND SUPPORTING REVERSAL**

Priya Leeds
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

Brandon R. Gould
John D. Graubert
Jocelyn G. Jezierny
Carolyn F. Corwin
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

September 24, 2024

*Attorneys for Amici Curiae*

# CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2 and Rule 28.2.1, undersigned counsel of record for amici curiae certifies that the following listed persons and entities, in addition to those listed in the Defendants-Appellants' Brief, have an interest in this brief.

Amici Curiae
Brady Center to Prevent Gun Violence
March For Our Lives
Giffords Law Center to Prevent Gun Violence
Everytown For Gun Safety Support Fund

Counsel for Amici Curiae
Brandon R. Gould
John D. Graubert
Carolyn F. Corwin
Jocelyn G. Jezierny
Priya Leeds
*Covington & Burling LLP*

Dated: September 24, 2024

*/s/ Brandon R. Gould*
Brandon R. Gould

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICI CURIAE .............................................................. 1

INTRODUCTION .................................................................................. 3

SUMMARY OF ARGUMENT ................................................................. 6

I.    The Final Rule Promotes Public Safety. ...................................... 10

II.   The Final Rule Will Assist Law Enforcement. ........................... 21

III.  The District Court's Analysis Is Erroneous and Disregards Congress's Purpose of Promoting Public Safety. .................. 24

CONCLUSION ...................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*City of Syracuse v. ATF,*
  No. 20-cv-06885 (S.D.N.Y. 2020)......................................1

*District of Columbia v. Heller,*
  554 U.S. 570 (2008).....................................................1

*Everytown for Gun Safety Support Fund v. ATF,*
  No. 21-cv-00376 (S.D.N.Y. 2021)....................................1

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010).....................................................1

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York,*
  597 U.S. 1 (2022)........................................................1

*Ruan v. United States,*
  597 U.S. 450 (2022)....................................................27

*United States v. Aulet,*
  S.D. Fla., No. 21-cr-80151 (Oct. 13, 2022) ...................18

*United States v. Braziel,*
  N.D. Tex. No. 5:20-CR-128-H (Oct. 7, 2020) ................14

*United States v. Cunningham,*
  E.D. Pa., No. 22-cr-268 (Oct. 7, 2022) ....................18, 20

*United States v. Dantinor,*
  S.D. Fla., No. 21-cr-60301 (Aug. 25, 2021) ..................22

*United States v. Dimas,*
  M.D. Fla., No. 21-cr-109 (Aug. 3, 2022) ......................18

*United States v. Estep,*
  D. S.C., Criminal No. 2:22-518 (Aug. 9, 2022)...............20

*United States v. Feldman,*
  D. Minn., No. 16-cr-53 (Feb. 16, 2016)........................19

*United States v. Hayes*,
   555 U.S. 415, 427 (2009).........................................................................1

*United States v. Kelly*,
   N.D. Ga., No. 20-cr-365 (Oct. 3, 2020) ................................................18

*United States v. Martin*,
   W.D. Mich., No. 22-cr-112 (Jan. 17, 2023)..........................................20

*United States v. Oliver*,
   D. Ariz., No. 21-cr-600 (May 10, 2022) ...............................................18

*United States v. Rachal*,
   M.D. N.C., No. 22-cr-337 (Feb. 2, 2023).........................................18, 20

*United States v. Rahimi*,
   144 S. Ct. 1889 (2024)..............................................................................1

*VanDerStok v. Garland*,
   No. 23-10718 (5th Cir. Aug. 16, 2023) ...................................................1

**Statutes**

18 U.S.C.
   § 921(a)(13)................................................................................................26
   § 922(b)(1).................................................................................................16
   § 922(d)(9).................................................................................................10
   § 922(z). ....................................................................................................16
   § 923(g)(3)(A)............................................................................................22
   § 923(g)(5)(A)............................................................................................22
   § 923(g)(6).................................................................................................22
   § 923(g)(7).................................................................................................21

Bipartisan Safer Communities Act,
   Pub. L. 117-159, 136 Stat. 1313 (2022)........................................passim

Brady Handgun Violence Prevention Act,
   Pub. L. 103-159, 107 Stat. 1536 (1993).................................................14

Firearm Owners' Protection Act,
   Pub. L. 103-159, 100 Stat. 449 (1986)....................................................10

Gun Control Act,
    Pub. L. 90-618, 82 Stat. 1213 (1968).............................. passim

## Regulations

27 C.F.R. § 478.11 ....................................................26

27 C.F.R. § 478.39a ..................................................22

89 Fed. Reg. 28968 (Apr. 19, 2024) ........................... passim

## Other Authorities

168 Cong. Rec. S3045 (daily ed. June 22, 2022).....................14

A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF
    LEGAL TEXTS 167 (2012). ...................................26

ATF, Gun Shows: Brady Checks and Crime Gun Traces (Jan. 1999). ..13

ATF, *N.F.C.T.A., Vol. II, Part II: National Tracing Center Overview*
    (Jan. 2023) ...............................................21, 23

ATF, National Firearms Commerce and Trafficking Assessment
    (NFCTA): Firearms Trafficking Investigations, Volume Three, Part
    XI: Summary and Conclusions (Apr. 4, 2024). ....................17

Connor Brooks, Background Checks for Firearms Transfers, 2019-2020,
    U.S. Department of Justice, Office of Justice Programs, Bureau of
    Justice Statistics (Nov. 2023). ...............................15

Daniel W. Webster et al., Preventing the Diversion of Guns to Criminals
    through Firearm Sales Laws, in REDUCING GUN VIOLENCE IN
    AMERICA (Daniel W. Webster & Jon S. Vernick eds., 2013) .............15

Daniel Webster et al., Effects of State-Level Firearm Seller
    Accountability Policies on Firearm Trafficking, 86 J. Urban Health
    525 (2009) ...................................................15

Eric W. Fleegler et al., Firearm Legislation and Firearm-Related
    Fatalities in the United States, 173 JAMA Intern. Med. 732 (2013)..15

Everytown for Gun Safety Support Fund, *Unchecked: An Investigation of the Online Firearm Marketplace* (Feb. 1, 2021). ..............................12

Letter from Charles Houser, Chief, Nat'l Tracing Ctr., to Fed. Firearms Licensees (Jul. 12, 2011)........................................................................22

Miller et al., *Firearm Acquisition Without Background Checks*, 166 Annals of Internal Med. 233 (2017). ......................................................16

Policy Brief, Michael Siegel & Claire Boine, Rockefeller Inst. of Govt., What are the Most Effective Policies in Reducing Gun Homicides? (2019) ...............................................................................................................15

S. Rep. No. 90-1501 (1968) ........................................................................6

Sahil Kapur, A Quiet Bipartisan Effort on Gun Background Checks May Have A Path to a Deal, NBC News (May 26, 2021)......................14

Sean Campbell & Colin Lecher, *Millions of Guns For Sale. Few Questions Asked.*, The Trace (Jan. 16, 2020)........................................11

U.S. Att'ys Off., D. Ariz., Gilbert Man Sentenced to 33 Months for Dealing in Firearms Without a License (Nov. 16, 2022) .....................18

U.S. Att'ys Off., D. Minn., *Saint Paul Man Sentenced to 18 Months in Prison for Dealing Firearms Without a License* (Aug. 30, 2016) .........19

U.S. Att'ys Off., N.D. Tex., Man Who Sold Midland/Odessa Shooter AR-15 Used in Massacre Pleads Guilty to Unlicensed Firearms Dealing (Oct. 7, 2020). ......................................................................................14

U.S. Att'ys Off., W.D. Mich., *Firearm Trafficker Sentenced to 37 Months in Federal Prison* (Jan. 23, 2023) ........................................................20

## INTEREST OF AMICI CURIAE

Amici are four non-profit organizations dedicated to promoting life-saving firearms regulations, with significant experience participating as amici in cases involving firearm laws and regulations.[1] Amicus Brady Center to Prevent Gun Violence ("Brady") is the nation's longest-standing non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. Amicus March For Our Lives ("MFOL") is a youth-led non-profit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives. Amicus Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a survivor-led non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their

---

[1] *See, e.g.*, *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady brief). Amici all filed amicus briefs in *United States v. Rahimi*, 144 S. Ct. 1889 (2024) and *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 597 U.S. 1 (2022); *VanDerStok v. Garland*, No. 23-10718 (5th Cir. Aug. 16, 2023) (amicus filed for Brady, MFOL, and Everytown); *Everytown for Gun Safety Support Fund v. ATF*, No. 21-cv-00376 (S.D.N.Y. 2021) (challenge to ATF action); *City of Syracuse v. ATF*, No. 20-cv-06885 (S.D.N.Y. 2020) (challenge to ATF actions). Brady and Giffords Law Center also filed amicus briefs in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

communities. Amicus Everytown for Gun Safety Support Fund is the education, research, and litigation arm of Everytown for Gun Safety ("Everytown"), the largest gun violence prevention organization in the country.[2]

---

[2] Counsel for amici certify that no party's counsel authored this brief in whole or in part and that no person other than amici and their counsel funded the preparation or submission of this brief. All parties have consented or stated that they do not oppose the timely filing of this brief.

**INTRODUCTION**

Congress passed the Bipartisan Safer Communities Act of 2022, Pub. L. 117-159, 136 Stat. 1313 ("BSCA") to amend the Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 ("GCA")—based, in significant part, on the recognition that there was a vast sector of commercial gun sellers who had evaded important requirements of the GCA applicable to gun dealers. In particular, many commercial sellers of firearms on the internet and at gun shows had not obtained the license required for such sales (a "Federal Firearms License" or "FFL") and, therefore, did not fulfill the GCA's requirements for licensees, including by maintaining records, undergoing inspections and oversight by ATF, and complying with the all-important duty to conduct background checks of prospective buyers. These sellers often claimed that they were exempt from the GCA requirements because they were hobbyists or personal collectors or that the coverage of the statute was unclear.

As discussed below, evasion of the GCA licensing requirements for commercial sellers significantly reduces public safety, allowing millions of firearms to be sold without background checks, potentially placing them in the hands of people prohibited by statute from possessing

firearms, including those with certain types of criminal convictions. In addition, evasion of the GCA requirements, particularly the recordkeeping requirements that the statute imposes on licensed dealers, seriously hampers law enforcement's crime fighting efforts.

In an effort to end evasion of the GCA requirements, Congress, by statute, tasked the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of the U.S. Department of Justice ("DOJ") with the responsibility of more clearly defining when firearms sellers are "engaged in the business" of commercial dealing in firearms in order to effectively enforce the BSCA's provisions.

In response, based on its decades of investigative and enforcement experience and court rulings across the country, ATF carefully crafted regulations to reach various gun sellers whom Congress intended to regulate through the BSCA: those engaged in commercial transactions with intent to profit. Congress decided to ensure that when these people sell firearms through the internet and other marketplaces (including gun shows) they must obtain a license, just as brick-and-mortar firearms dealers must do. *See* Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28968 (Apr. 19, 2024) ("Final Rule"). At the

same time, the Final Rule clarifies that individuals who make occasional sales as part of a hobby or to manage a personal collection do not need to obtain licenses. The Final Rule helps individuals on both sides of that line understand when they need a license under the GCA, and when they do not.

In enjoining the Final Rule, the district court misread the relevant statutes and the Final Rule itself. The court failed to give sufficient—or even any—weight to the significant evasion of GCA requirements that Congress attempted to address with the BSCA. The district court further disregarded the major negative impact this evasion has had on public safety and law enforcement.

The district court's decision also reflects a failure to appreciate the challenge ATF faced in responding to Congress's mandate: to develop a definition that would end the dangerous evasion of the GCA's requirements while preserving the exemption for occasional sales by collectors and hobbyists. Nuanced determinations are required to properly draw this line. The court's rejection of ATF's careful line-drawing and its order enjoining enforcement of the Final Rule frustrate Congress's statutory direction to regulate commercial firearms sales. The

result of the decision below is to eliminate the significant protection for the public and assistance to law enforcement provided by the Final Rule and intended by Congress when it enacted the BSCA.

## SUMMARY OF ARGUMENT

The Final Rule is not only consistent with the GCA, as amended by the BSCA; it is essential to effectively implement the BSCA's requirements and serve Congress's primary goals in the GCA of "keep[ing] firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency, and [assisting] law enforcement authorities in the states and their subdivisions in combating the increasing prevalence of crime in the United States," S. Rep. No. 90-1501 at 22 (1968). Critically, the Final Rule achieves these goals by laying out a rational framework for distinguishing covered gun dealers from those legitimately entitled to the exemption for true hobby and personal collection transactions.

Congress enacted the GCA because firearms are particularly dangerous when they fall into the wrong hands. Accordingly, the statute expressly requires those engaged in the business of selling firearms to obtain a license and abide by standards of conduct designed to prevent

unlawful sales. Congress has determined that certain individuals are especially likely to use firearms to harm themselves or others, and the statutory requirements are tailored in large part to prevent firearms from ending up in the hands of those individuals.

The Final Rule faithfully implements the BSCA's amendments to the GCA, and in doing so, promotes public safety and assists law enforcement efforts. It provides needed clarification to enable individuals to ascertain whether they are required to hold an FFL. Moreover, the Final Rule properly distinguishes between hobbyists and collectors, on the one hand, and commercial sellers, on the other. In clarifying when an individual must hold an FFL, the Final Rule effectively responds to changes to the firearms marketplace that have facilitated the evasion of longstanding statutory requirements, thereby helping to keep firearms out of the hands of those who may use them to cause harm. In striking down the Final Rule, the decision below frustrates Congress's purposes in enacting the BSCA of promoting public safety, including by assisting law enforcement.

# ARGUMENT

In responding to Congress's mandate to develop an effective and enforceable definition of "engaged in the business," ATF faced the challenge of drawing a line between commercial gun sellers and the hobbyists and personal collectors whose occasional sales are exempted from the GCA's requirements. The Final Rule answers that challenge by laying out a reasonable set of criteria. This was an entirely appropriate way to faithfully implement the GCA, fulfilling Congress's purpose of enhancing public safety and the interests of law enforcement by substantially reducing evasion of the GCA requirements.

The Final Rule helps law-abiding individuals and supports effective enforcement of the GCA, as amended by the BSCA, by enumerating specific factors that indicate a person is dealing in firearms with the predominant intent to earn a profit from those transactions. These factors—helpfully clarified through rebuttable presumptions set out in the Final Rule—assist individuals in determining when the statute requires licensure. The factors, which are "supported by [DOJ]'s investigative and regulatory efforts and experience," Final Rule, 89 Fed. Reg. at 28982, as well as a significant body of case law, enable individuals

to understand when ATF will conclude that they are covered by the statute (rather than when they are merely acting as a collector or hobbyist, or making an occasional sale). This can be a difficult line to draw, and the presumptions help individuals understand ATF's analysis of the statute.

Moreover, the presumptions will assist ATF in determining when to enforce the GCA prohibition on unlicensed commercial selling. The factors set forth in the presumptions will place unlicensed sellers who are engaged in the business on notice that ATF believes their selling amounts to unlicensed activity. Such persons can then become licensed and continue to sell firearms for a profit while complying with background check requirements and other GCA regulations. Or, they can argue to ATF why the terms of the Final Rule do not apply to them.

The Government's opening brief explains at length why the Final Rule is consistent with the language of the statute and prior judicial precedents. Amici agree with these arguments. In this brief, Amici focus primarily on the district court's failure to take into consideration the impact of its ruling on Congress's key concern—public safety, including the impact on law enforcement.

## I. The Final Rule Promotes Public Safety.

The new rule promulgated by ATF is necessary to faithfully implement the GCA, as amended by the BSCA. Congress's aim in enacting the statute was to prevent firearm sales to individuals prohibited by law from accessing firearms. *See, e.g.*, 18 U.S.C. § 922(d)(9) ("It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person, including as a juvenile . . . has been convicted in any court of a misdemeanor crime of domestic violence."). The Final Rule is critical in closing the gap in enforcement that has arisen from technological and marketing changes that have dramatically altered the nature of the firearms marketplace—the same gap Congress intended to address through the BSCA. By closing the gap, the Final Rule will further public safety, including by assisting law enforcement.

ATF recognized that when the GCA and the Firearm Owners' Protection Act, Pub. L. 103-159, 100 Stat. 449 ("FOPA")[3] were enacted in 1968 and 1986, respectively, firearms transactions generally occurred in

---

[3] FOPA revised the GCA to exclude individuals making occasional sales or repairs from the definition of dealer.

brick-and-mortar establishments and the internet was not available to the public (or did not yet exist). 89 Fed. Reg. at 28973-74. Since that time, the firearms business has evolved in significant respects. Gun shows have grown to provide a major forum for unlicensed sellers to sell firearms without background checks. See Final Rule, 89 Fed. Reg. at 28973. Moreover, unlicensed sellers now advertise guns for sale through internet "brokers" and auctions, and sell to unknown buyers. *Id.*

On the online firearms marketplace Armslist, many unlicensed sellers conduct high volumes of sales, with evident intent to earn a profit, but evade the obligation that licensees have to conduct background checks on purchasers and maintain records of sales. An investigation of Armslist firearms listings posted between December 2016 and March 2019 found 700 phone numbers that appeared in ten or more listings; 150 that were linked to 25 or more; 38 that appeared in 50 or more; and even one phone number that was associated with over 300 posts. Only 14 of the phone numbers attached to a high volume of ads appeared in ATF's database of federal firearms licensees. Sean Campbell & Colin Lecher, *Millions of Guns For Sale. Few Questions Asked.*, The Trace (Jan. 16, 2020), https://www.thetrace.org/2020/01/armslist-unlicensed-gun-sales-

engaged-in-the-business.

Because unlicensed sellers using Armslist and other such websites do not conduct background checks on purchasers, they provide firearms access to buyers who could not legally buy these weapons from licensees— or possess them at all. According to a study conducted by amicus Everytown, nearly one in nine prospective buyers who responded to ads posted by unlicensed sellers on Armslist could not legally own a firearm due to, for instance, convictions for violent felonies, being underage, or having other statutory restrictions. Everytown for Gun Safety Support Fund, *Unchecked: An Investigation of the Online Firearm Marketplace* (Feb. 1, 2021), https://everytownresearch.org/report/unchecked-an-investigation-of-the-online-firearm-marketplace/.

Congress and ATF recognized the clear threat to public safety posed by the explosion in unlicensed selling. In particular, when sellers fail to conduct background checks, a legally prohibited person who would not otherwise be able to obtain a firearm legally could obtain one and subsequently use it to harm people. *See infra* nn.12-14. But the danger also is systemic: unlicensed firearms vendors at gun shows create a competitive disadvantage for licensed vendors that *do* comply with

licensure requirements, creating a disincentive for licensure and for compliance with the background check requirement.[4] The decline in licensed gun dealers also results in loss of revenue for state and local governments.[5]

ATF properly understood that requiring licensure of all sellers that engage in commercial firearms transactions is essential to accomplish Congress's central purpose in enacting the GCA and the BSCA—to promote public safety. The amendments to the definition of "engaged in the business" in the BSCA were designed to clarify and expand the licensing requirement, and prevent the evasion of the background check system by unlicensed sellers.

Senators Chris Murphy and John Cornyn, both BSCA sponsors, invoked the Midland-Odessa mass shootings in Texas on August 31, 2019, as a concrete example of the need to clarify federal law to prevent

---

[4] ATF, Gun Shows: Brady Checks and Crime Gun Traces 18 (Jan. 1999) (finding that, in an ATF survey about gun shows, some licensed dealers "expressed frustration that unlicensed persons were able to sell to buyers without any paperwork (and advertise this fact), leaving the [licensed dealer] at a competitive disadvantage").

[5] See, e.g., Analysis of the Decline in Gun Dealers, supra, at 24 ("[N]one of the private sellers who exhibited indicia of being illegally 'engaged in the business' collected sales tax, even though all three states involved in this investigation require taxes on frequent, profit-oriented sales. Violation of these laws defrauds state, and often local, governments of revenue. Furthermore, several private sellers used the lack of sales tax as a selling point").

unlicensed dealing. *See* 168 Cong. Rec. S3045, 3055 (daily ed. June 22, 2022).[6] The gunman there was federally prohibited from buying a gun because of his mental health history and was denied a sale when he visited a licensed gun shop. But he then found an unlicensed seller, Marcus Braziel, on Armslist. Without conducting a background check, Mr. Braziel transferred the firearm to the shooter, who then used it to kill seven people and wound 25 others.[7] As Senator Murphy explained, Mr. Braziel was in fact engaged in the business, but "didn't believe the definition applied to him because the definition is admittedly confusing." 168 Cong. Rec. S3045, 3055.[8]

The cornerstone of the GCA is the Brady Handgun Violence

---

[6] *See also* Sahil Kapur, A Quiet Bipartisan Effort on Gun Background Checks May Have A Path to a Deal, NBC News (May 26, 2021), https://www.nbcnews.com/politics/congress/quiet-bipartisan-effort-gun-background-checks-may-be-verge-deal-n1268630.

[7] *See* U.S. Att'ys Off., N.D. Tex., Man Who Sold Midland/Odessa Shooter AR-15 Used in Massacre Pleads Guilty to Unlicensed Firearms Dealing (Oct. 7, 2020), www.justice.gov/usao-ndtx/pr/man-who-sold-midlandodessa-shooter-ar-15-used-massacre-pleads-guilty-unlicensed.

[8] Moreover, the facts in this case indicated that Mr. Braziel informed a licensed dealer that he thought he could build and sell guns "as long as it's not your main source of income," and Mr. Braziel stated to ATF that he thought his firearms dealing was just a "hobby." *United States v. Braziel*, N.D. Tex. No. 5:20-CR-128-H, Factual Resume 6-7 (Oct. 7, 2020). If Mr. Braziel or the licensed dealer with whom he had spoken had had more guidance than just the statutory text at the time, then the licensed dealer would have had better reasons to refuse to aid Mr. Braziel's illegal dealing or perhaps Mr. Braziel would have thought twice about continuing his unlicensed dealing.

Prevention Act, Pub. L. 103-159, 107 Stat. 1536 (1993) (the "Brady Law"), which provides that licensed dealers must conduct background checks before transferring a firearm. Such checks keep guns out of the hands of prohibited persons: since its enactment in 1993, the Brady Law has stopped over *four million* prohibited firearms transactions.[9]

Background checks also reduce gun trafficking and violence. States that go beyond the GCA to require background checks even for unlicensed gun sales have lower rates of illegal gun trafficking, ten percent lower homicide rates, and significantly lower rates of firearm suicide.[10]

Prior to the BSCA's passage, an increasing number of individuals sold firearms with intent to profit every year without the safeguard of

---

[9] *See* Connor Brooks, Background Checks for Firearms Transfers, 2019-2020, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (Nov. 2023), https://bjs.ojp.gov/document/bcft1920.pdf.

[10] *See, e.g.*, Daniel Webster et al., Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking, 86 J. Urban Health 525 (2009) (finding that comprehensive regulation and oversight of gun dealers and state regulation of private sales of handguns were each associated with significantly lower levels of intrastate gun trafficking); Daniel W. Webster et al., Preventing the Diversion of Guns to Criminals through Firearm Sales Laws, in REDUCING GUN VIOLENCE IN AMERICA 117 (Daniel W. Webster & Jon S. Vernick eds., 2013) (finding that state-level regulation of private sales reduced interstate trafficking by 29 percent); Policy Brief, Michael Siegel & Claire Boine, Rockefeller Inst. of Govt., What are the Most Effective Policies in Reducing Gun Homicides? 9 (2019), https://rockinst.org/wp-content/uploads/2019/03/3-28-19-Firearm-Laws-Homicide-Deaths-Brief.pdf; Eric W. Fleegler et al., Firearm Legislation and Firearm-Related Fatalities in the United States, 173 JAMA Intern. Med. 732 (2013).

background checks or other ATF oversight. Alarmingly, as of 2017, one in every five guns sold in the United States was sold without a background check. At least 20 percent of firearms sold—millions annually—are transferred without any confirmation that the recipient is not prohibited by federal law from possessing a gun. Miller et al., *Firearm Acquisition Without Background Checks*, 166 Annals of Internal Med. 233 (2017). While some of these transactions may be legitimate single transfers of a firearm from a personal collection that are exempt from licensure requirements, most are conducted by individuals who intentionally profit from multiple sales of firearms while avoiding the requirements that Congress established for licensed dealers.

In addition to the important background check requirement, firearms dealers are subject to other statutory obligations that exist to protect the public. For example, licensed dealers must provide child-safety locks with every transferred handgun. 18 U.S.C. § 922(z). Dealers must also abide by age restrictions; federal law prohibits the sale of handguns to anyone under 21 and long guns to anyone under 18. § 922(b)(1).

Countless firearms sold by unlicensed individuals who engage in

commercial transactions have been used in the commission of violent crimes. ATF investigations have shown that unlicensed dealers supply the illicit gun market, and prosecutions show that these dealers are a go-to source of firearms for buyers who cannot pass the background check that licensed dealers must conduct. In fact, a recent analysis of ATF firearms trafficking investigations between 2017 and 2021 found that unlicensed dealing by private persons was "the most frequently identified trafficking channel at nearly 41% of cases," leading ATF to conclude that "unregulated private sales facilitate the movement of a significant volume of firearms from the legal marketplace to prohibited persons."[11]

Firearms sold by unlicensed commercial dealers have often been recovered in the hands of persons prohibited by law from possessing

---

[11] *See* ATF, National Firearms Commerce and Trafficking Assessment (NFCTA): Firearms Trafficking Investigations, Volume Three, Part XI: Summary and Conclusions 2 (Apr. 4, 2024), https://www.atf.gov/firearms/docs/report/nfcta-volume-iii-part-xi/download. This analysis also found that: (1) unlicensed dealers were associated with "the largest number of trafficked firearms (68,388) and averaged 20 trafficked firearms per investigation"; (2) in 16 percent of cases, firearms trafficked through unlicensed dealers were used in shootings; and (3) firearms trafficked by unlicensed firearm dealers circumvent background checks—approximately 60 percent of the end users of trafficked firearms had at least one prior felony conviction. *Id.*

them,[12] at crime scenes both domestic and international,[13] and in investigations involving armed robbery and murder.[14]

For example, in 2016, a defendant was sentenced to 18 months in prison for illegally dealing in firearms without a license. The defendant "regularly dealt firearms without a license" by repeatedly purchasing firearms and within days of obtaining them offering them for resale—

---

[12] *See, e.g.*, *United States v. Rachal*, M.D. N.C., No. 22-cr-337, Dkt. 22 (Feb. 2, 2023) (at least 27 firearms sold by defendant who pleaded guilty to unlicensed firearms dealing were recovered in four separate states; the investigation was aided by a convicted felon informant from whom law enforcement seized one of defendant's guns, and who admitted to purchasing "numerous" firearms from defendant over the past year even after the informant advised defendant that he was prohibited from possessing firearms).

[13] *See, e.g.*, *United States v. Aulet*, S.D. Fla., No. 21-cr-80151, Dkt. 36 (Oct. 13, 2022) (at least 28 firearms sold by unlicensed dealer defendant were later recovered in crimes including a homicide in North Miami, Florida; pursuant to another federal firearms trafficking investigation in Texas; and in various crimes in Nassau, Bahamas); *United States v. Dimas*, M.D. Fla., No. 21-cr-109, Dkt. 39 (Aug. 3, 2022) (four firearms sold to a cartel associate by unlicensed defendant were recovered by Mexican military personnel in Tamaulipas, Mexico, following firefights with suspected cartel members); *United States v. Kelly*, N.D. Ga., No. 20-cr-365, Dkt. 1 (Oct. 3, 2020) (multiple firearms re-sold and shipped by defendants to international buyers were recovered with obliterated serial numbers in the United Kingdom and St. Kitts, and tied to various criminal networks abroad).

[14] *See, e.g.*, *United States v. Cunningham*, E.D. Pa., No. 22-cr-268, Dkt. 25 (Oct. 7, 2022) (co-defendants resold approximately 60 guns, at least 24 of which were later recovered in numerous shootings and homicides in Philadelphia); *United States v. Oliver*, D. Ariz., No. 21-cr-600, Dkt. 41 (May 10, 2022) (at least 30 guns sold by unlicensed dealer defendant were recovered by law enforcement, including in six separate homicide investigations, one of which involved the shooting and killing of a Stockton, California, police officer responding to a domestic violence call, *see* U.S. Att'ys Off., D. Ariz., Gilbert Man Sentenced to 33 Months for Dealing in Firearms Without a License (Nov. 16, 2022), https://www.atf.gov/news/press-releases/gilbert-man-sentenced-33-months-dealing-firearms-without-license).

often for profit—on Armslist. Multiple firearms sold by the defendant were linked to crime scenes, including assault and drug trafficking, within days of his reselling them.

According to the indictment, the defendant sold two firearms to undercover ATF officers for cash in the parking lot of a mall, telling one that he was a "gun collector" and making no effort to obtain identification or determine the firearms eligibility status of either. *United States v. Feldman*, D. Minn., No. 16-cr-53, Dkt. 1 (Feb. 16, 2016). *See also* U.S. Att'ys Off., D. Minn., *Saint Paul Man Sentenced to 18 Months in Prison for Dealing Firearms Without a License* (Aug. 30, 2016), https://www.justice.gov/usao-mn/pr/saint-paul-man-sentenced-18-months-prison-dealing-firearms-without-license.

In another example, the defendant was sentenced to 37 months in federal prison for trafficking guns used in several crimes throughout Michigan in 2021. The defendant purchased guns from licensed gun dealers and immediately resold them to his "customers," including convicted felons prohibited from buying guns for themselves, for a profit. Mere months after the defendant resold those guns, 14 of them had been recovered by police. One was used to shoot an 11-year-old girl; two were

used in separate homicides (including one in the slaying of 2-year-old Khalise Brewer); another was used in a shooting injuring four people in downtown Grand Rapids and was subsequently linked to two additional shootings; and a fourth was used in three separate drive-by shootings. *United States v. Martin*, W.D. Mich., No. 22-cr-112, Dkt. 28 (Jan. 17, 2023); *see also* U.S. Att'ys Off., W.D. Mich., *Firearm Trafficker Sentenced to 37 Months in Federal Prison* (Jan. 23, 2023), [www.atf.gov/news/pr/firearm-trafficker-sentenced-37-months-federal-prison](www.atf.gov/news/pr/firearm-trafficker-sentenced-37-months-federal-prison).

These cases, which are merely the tip of the iceberg, show that there had been widespread evasion of the statutory requirement that commercial gun sellers be licensed. Indeed, in many prosecutions of unlicensed dealers, ATF had previously warned the defendants that they needed licenses but the defendants nevertheless continued to engage in unlicensed commercial sales.[15] By clarifying the definition of who is

---

[15] *See, e.g.*, Aff. ISO Application for a Warrant by Telephone or Other Reliable Electronic Means, Case No. 1:22MJ426-1, 19 ¶ 33 (M.D. N.C. Oct. 28, 2022) (*United States v. Rachal*, supra n.5); Aff. ISO Application Under Rule 41 for a Warrant to Search and Seize, Case No. 2:22-MJ-387, 4 ¶ 9 (S.D. Ohio June 1, 2022) (*United States v. Cunningham*, supra n.7). *See also United States v. Estep*, D. S.C. No. 2:22-518, Government's Opposition to Motion to Modify Bond 2-3, 4 (Aug. 9, 2022) (stating that "since August 2013, defendant has purchased at least 452 firearms from FFLs, at

engaged in the firearms business, the Final Rule will advance the statute's requirement that such unlicensed dealers obtain licenses. As a result, more firearms sales will be subject to background checks, ensuring that fewer prohibited purchasers evade those background checks— ultimately reducing gun violence.

## II.    The Final Rule Will Assist Law Enforcement.

The Final Rule will also advance public safety by helping law enforcement in important ways. Licensed dealers are required to maintain records that assist law enforcement in investigating and prosecuting illegal trafficking and gun-related violence. Licensed gun dealers must, within 24 hours of a request by ATF, provide firearm transaction information to ATF in the event that a firearm sold by that dealer is recovered in connection with a crime. 18 U.S.C. § 923(g)(7). This allows ATF to trace the firearm back to its first retail purchaser, a process that is critically important to investigating gun crime and gun trafficking. *See* ATF, *N.F.C.T.A., Vol. II, Part II: National Tracing Center Overview*

---

least 425 of which were purchased after ATF first advised defendant that it was illegal for him to engage in the business of selling firearms without a license").

1-3 (Jan. 2023), https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-ii-ntc-overview/download.

In addition, within 48 hours of discovery, licensed dealers must report when a firearm from the licensee's inventory or collection has been lost or stolen. *See* § 923(g)(6); 27 C.F.R. § 478.39a. They must report to ATF when a single purchaser buys more than one handgun in the same transaction or within a five-day period. 18 U.S.C. § 923(g)(3)(A), (5)(A). Similarly, dealers in southern border states must report multiple sales of semi-automatic rifles larger than .22 caliber with the ability to accept a detachable magazine. *See* Letter from Charles Houser, Chief, Nat'l Tracing Ctr., to Fed. Firearms Licensees (Jul. 12, 2011).

These records are critically important to law enforcement because ATF can use them to investigate potential illegal gun buyers and trafficking rings, to solve gun-related crime through efficient tracing, and to prevent future illegal trafficking and violent crime by identifying and contacting gun customers engaged in suspicious buying activities. *See, e.g.*, *United States v. Dantinor*, S.D. Fla., No. 21-cr-60301, Dkt. 1 (Aug. 25, 2021) (ATF initiated an investigation resulting in the discovery of a multi-defendant illegal gun trafficking ring in Southern Florida involving

well over 100 guns after the agency received multiple sale reports involving firearms purchased by one of the implicated individuals); ATF, *N.F.C.T.A., Vol. II, Part II: National Tracing Center Overview*, *supra*, at 8 (noting that in 2021 alone, over 40,473 traces were completed using these reports).

Unlicensed dealers' unrecorded, unvetted gun sales frustrate law enforcement's attempts to solve previous instances of gun crime and prevent gun crime in the future. Guns sold by unlicensed dealers are exceedingly difficult to trace; there is no effective way to track such guns beyond the first retail sale because subsequent unlicensed dealers maintain no transaction records that ATF can call upon to trace a gun from the manufacturer to the ultimate purchaser. And without required records reporting, law enforcement has significantly fewer tools to investigate and prevent gun trafficking and subsequent violence. The Final Rule facilitates law enforcement agencies' efforts to trace firearms and prevent further gun violence by ensuring that individuals who are engaged in the business of dealing in firearms obtain licenses and abide by recordkeeping requirements.

### III. The District Court's Analysis Is Erroneous and Disregards Congress's Purpose of Promoting Public Safety.

The district court rejected the Final Rule on several grounds, all of which are erroneous and fly in the face of the key public safety purpose underlying the GCA and the BSCA. The court first held that the statutory language requires *both* repetitive sales and actual profit in order to find that an individual is engaged in the firearms business. Decision at 9-10. This was a clear misreading of the text of the statute. As the court was aware, the BSCA requires only the "intent" "to predominantly earn a profit" from gun sales in order for a seller to be engaged in the commercial firearms business. BSCA § (a)(22), *cited at* Decision at 16. The court put forth a "negative corollary" argument that the statute's express statement that proof of profit is unnecessary in the case of persons who purchase and sell firearms for criminal purposes or terrorism implies that proof of actual profit *is* required for all other purchases and sales of firearms. Decision at 16. This argument is insufficient in light of the broad reference to intent at the outset of Section (a)(22).

It makes no sense to have the licensure requirement turn on whether a seller is actually profitable. Many businesses are unprofitable for various reasons, but this should not exempt them from generally

applicable public safety provisions designed to keep guns from ending up in the wrong hands. And if an individual stockpiled hundreds of guns in a warehouse and reserved tables at a dozen gun shows, it would be absurd to say that ATF could not consider that individual engaged in the business of selling guns, even if the person had not yet made a sale.

As for the issue of repetitive sales, the district court improperly zeroed in on one statement in the Final Rule that a single sale might be sufficient to require that a seller be licensed. Decision at 9. The court ignored that the Final Rule makes clear that "a single sale must be coupled with additional evidence to support a determination that the seller required a license," and that, "in any event, all presumptions in this rule are rebuttable." Final Rule, 89 Fed. Reg. at 29016. Moreover, given the statute's focus on intent to profit rather than actual profit, it would make no sense to require more than one sale in cases where, for instance, there is evidence that the seller intends to engage in many further sales. Such a result would be plainly inconsistent with Congress's purpose of promoting public safety.

The district court also erred in concluding that ATF's exclusion of firearms accumulated primarily for personal protection from the

definition of "personal collection" is an "untenable" interpretation. Decision at 18. In reaching its conclusion, the court cites to sources that urge consideration of "the entire text" of a statute, A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012). But the court ignored the fact that the GCA defines a "collector" as "any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define." 18 U.S.C. § 921(a)(13). The ATF regulations have long defined "curios or relics" as referring to "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or *defensive weapons*." 27 C.F.R. § 478.11 (emphasis added).

Further, the GCA nowhere exempts or otherwise excludes sales of firearms acquired for the purpose of personal protection from the licensing requirement. The Final Rule's definition of "personal collection" to exclude weapons primarily bought or sold for personal protection is therefore fully consistent with the entire text of the GCA.

Finally, the district court rejected ATF's use of rebuttable presumptions to describe the agency's view of facts that would show that

an individual was likely engaged in the sorts of repetitive sales for profit that would qualify as dealer activities. But these presumptions (which do not apply in the criminal context) are simply criteria the agency will consider, and they provide transparency for sellers. The presumptions are *rebuttable*. They would not alter the burden of proof, but would—at most—impose on firearms sellers a burden of production. *See Ruan v. United States*, 597 U.S. 450, 463-64 (2022) (stating that due process does not prohibit shifting the burden of production, which is not equivalent to shifting the burden of proof).

As the Government's opening brief explains, the presumptions are consistent with the text of the statute and with judicial precedent. They further the purpose of the statute by providing information to the public about when ATF will consider a seller to be engaged in the business of dealing in firearms and will therefore require the seller to obtain a license. This increased clarity will ultimately reduce the frequency of unlicensed dealers, with the downstream effect of increased public safety and assistance to law enforcement efforts.

**CONCLUSION**

For the reasons stated above and in the Government's opening brief, the judgment of the district court should be reversed.

Dated: September 24, 2024

Respectfully submitted,

*/s/ Brandon R. Gould*

Priya Leeds
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

Brandon R. Gould
John D. Graubert
Jocelyn G. Jezierny
Carolyn F. Corwin
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

*Attorneys for Amici Curiae*

# CERTIFICATE OF SERVICE

I, Brandon Gould, hereby certify that on September 24, 2024, I caused a copy of this Amicus Brief to be served by FedEx Priority Overnight, for delivery within three business days, upon:

Brandon Wilson Barnett
3000 Marine Corps Pentagon
Washington, DC 20350-3000

I further certify that I caused a copy of this Amicus Brief to be served by the Court's Electronic Case Filing System upon:

Kateland R. Jackson
Office of the Solicitor General
7th Floor
209 W. 14th Street
Austin, TX 78701
Tel.: 512-936-1700

Garrett M. Greene
Office of the Texas Attorney General
Special Litigation Division
209 W. 14th Street
Austin, TX 78701
Tel.: 512-936-2917

Kathleen Theresa Hunker
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, TX 78711-2548
Tel.: 512-936-2275

*Attorneys for Plaintiff/Appellee State of Texas*

Jorge Benjamin Aguinaga
Louisiana Department of Justice
1885 N. 3rd Street
Baton Rouge, LA 70802
Tel.: 225-506-3746

Kelsey LeeAnn Smith
Louisiana Department of Justice
Office of the Attorney General
1885 N. 3rd Street
Baton Rouge, LA 70802
Tel.: 225-428-7432

*Attorneys for Plaintiff/Appellee State of Louisiana*

Justin Lee Matheny
Mississippi Attorney General's Office
Suite 1200
550 High Street
Jackson, MS 39201
Tel.: 601-359-3825
Fax: 601-359-2003

*Attorney for Plaintiff/Appellee State of Mississippi*

Andrew Dymek
Utah Attorney General's Office
Civil Appeals
5th Floor
160 E. 300, S.
Salt Lake City, UT 84114-0857
Tel.: 801-366-0533

*Attorney for Plaintiff/Appellee State of Utah*

Robert J. Olson
William J. Olson, P.C.
Suite 4
370 Maple Avenue, W.
Vienna, VA 22180-5615
Tel.: 703-356-5070
Fax: 703-356-5085

John I. Harris, III
Suite 460
3310 West End Avenue
Nashville, TN 37203
Tel.: 615-244-6670
Fax: 615-254-5407

Oliver Krawczyk
Ambler Law Offices, L.L.C.
Suite 100
115 S. Hanover Street
Carlisle, PA 17013
Tel.: 717-525-5822
Fax: 540-773-2414

Stephen Dean Stamboulieh
Stamboulieh Law, P.L.L.C.
P.O. Box 428
Olive Branch, MS 38654
Tel.: 601-852-3440

*Attorneys for Plaintiffs/Appellees Jeffrey W. Tormey, Gun Owners of America, Incorporated, Gun Owners Foundation, Tennessee Firearms Association, and Virginia Citizens Defense League*

Bradley Hinshelwood
Kevin J. Kennedy
Michael S. Raab
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel.: 202-514-7823

Jeremy Samuel Bloch Newman
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel.: 202-532-3114

*Attorneys for Defendants/Appellants Bureau of Alcohol, Tobacco, Firearms, and Explosives, United States Department of Justice, Merrick Garland, in his official capacity as Attorney General of the United States, and Steven Dettelbach, in his official capacity as Director of Bureau of Alcohol, Tobacco, Firearms, and Explosives*

*/s/ Brandon R. Gould*
Brandon R. Gould

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I, Brandon Gould, hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,684 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point, Century Schoolbook font.

Dated: September 24, 2024

*/s/ Brandon R. Gould*
Brandon R. Gould