No. 24-10612

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF UTAH; JEFFREY W. TORMEY; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION; TENNESSEE FIREARMS ASSOCIATION; VIRGINIA CITIZENS DEFENSE LEAGUE,

*Plaintiffs-Appellees,*

*v.*

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas

**BRIEF FOR APPELLEES**
*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for State of Texas*
*Plaintiff-Appellee*

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General

KATELAND R. JACKSON
Assistant Solicitor General
Kateland.Jackson@oag.texas.gov

ERIC S. ABELS
Assistant Attorney General

ROBERT J. OLSON
William J. Olson, PC
370 Maple Ave. W., Ste. 4
Vienna, VA 22180
rob@wjopc.com

STEPHEN D. STAMBOULIEH
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
stephen@sdslaw.us

JOHN I. HARRIS III
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, TN 37203
jharris@slblawfirm.com

OLIVER M. KRAWCZYK
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
oliver@amblerlawoffices.com

*Counsel for Plaintiffs-Appellees Jeffrey W.*
*Tormey, Gun Owners of America, Inc., Gun*

*Owners Foundation, Tennessee Firearms Association, and Virginia Citizens Defense League*

[Additional counsel listed in signature block]

# Certificate of Interested Persons

No. 24-10612

State of Texas; State of Louisiana; State of Mississippi; State of Utah; Jeffrey W. Tormey; Gun Owners of America, Incorporated; Gun Owners Foundation; Tennessee Firearms Association; Virginia Citizens Defense League,

*Plaintiffs-Appellees*,

*v.*

Bureau of Alcohol, Tobacco, Firearms and Explosives; United States Department of Justice; Merrick Garland, in his official capacity as Attorney General of the United States; Steven Dettelbach, in his official capacity as Director of Bureau of Alcohol, Tobacco, Firearms and Explosives,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, State appellees, as a governmental party, need not furnish a certificate of interested persons.

/s/ Kateland R. Jackson
Kateland R. Jackson
*Counsel of Record for State of Texas*
*Plaintiff-Appellee*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal:

Jeffrey W. Tormey

Gun Owners of America, Inc. ("GOA") is a non-profit, non-stock corporation. GOA has no parent corporation or subsidiaries, and no publicly held corporation holds any stock in GOA.

i

Gun Owners Foundation ("GOF") is a non-profit, non-stock corporation. GOF has no parent corporation or subsidiaries, and no publicly held corporation holds any stock in GOF.

Tennessee Firearms Association ("TFA") is a non-profit, non-stock corporation. TFA has no parent corporation or subsidiaries, and no publicly held corporation holds any stock in TFA.

Virginia Citizens Defense League ("VCDL") is a non-profit, non-stock corporation. VCDL has no parent corporation or subsidiaries, and no publicly held corporation holds any stock in VCDL.

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654

Robert J. Olson
William J. Olson, PC
370 Maple Ave. W., Ste. 4
Vienna, VA 22180

Brandon W. Barnett
Barnett Howard & Williams PLLC
930 W. 1st St., Suite 202
Fort Worth, TX 76102

John I. Harris III
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, TN 37203

Oliver M. Krawczyk
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013

/s/ Robert J. Olson
Robert J. Olson
*Counsel for Plaintiffs-Appellees Jeffrey W. Tormey, Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, and Virginia Citizens Defense League*

## Statement Regarding Oral Argument

Many law-abiding individuals privately purchase and sell firearms. Whether a federal agency may, by regulatory fiat, regulate those sales by labeling hundreds of thousands of private sellers as firearms dealers is at issue. The district court enjoined the federal government from enforcing the regulation against the plaintiffs and within the plaintiff States. Appellees agree with Appellants that the Court would benefit from oral argument in this case.

# Table of Contents

Page

Certificate of Interested Persons ..............................................................i

Statement Regarding Oral Argument ...................................................iv

Table of Authorities ...........................................................................viii

Introduction.......................................................................................... 1

Statement of Jurisdiction .................................................................... 2

Issues Presented .................................................................................. 2

Statement of the Case ......................................................................... 2

    I.   Statutory History ..................................................................... 2

    II.  Regulatory History .................................................................. 4

    III. Procedural History ................................................................. 4

Summary of the Argument................................................................... 5

Standard of Review ............................................................................. 6

Argument.............................................................................................. 6

    I.   All Appellees Have Standing to Assert Their Claims. ............... 6

        A.  Tormey has standing. ........................................................ 7

        B.  The associations have standing. ...................................... 10

            1.   GOA, TFA, and VCDL have standing...................... 11

            2.   GOF has standing. ................................................... 13

        C.  The States have standing.................................................. 14

    II.  Appellees Are Likely to Succeed on the Merits..................... 16

        A.  The statute requires actual purchases and resales of firearms............ 17

        B.  The statute requires actual profit. .................................. 23

        C.  The Rule eviscerates the statute's safe harbor provisions.................. 27

        D.  The Rule's presumptions flip the statutory burden of proof, presuming perfectly innocuous conduct to be evidence of criminal activity. .............................................................. 33

        E.  The rule is unlawful and unconstitutional on numerous other grounds the district court did not reach........................... 37

1.  ATF cannot redefine that which Congress has already defined. ...................................................................... 37

2.  ATF cannot define simple, unambiguous statutory terms. .......... 38

3.  The Rule creates extra-statutory terms. ...................................... 39

4.  Lenity demands resolution of any lingering ambiguity in favor of Appellees. ....................................................................... 39

5.  The Rule violates Appellees' constitutional rights. .................... 40

    a.  The Rule violates the Second Amendment. ......................... 41

    b.  The Rule Violates the Fourth Amendment. ......................... 41

    c.  The Rule is void for vagueness. .......................................... 42

    d.  The Rule violates the separation of powers. ....................... 43

III.  Equitable Factors Support Preliminary Injunctive Relief. ...................... 44

IV.  The District Court's Preliminary Relief Is Not Overbroad. .................... 45

Conclusion ............................................................................................................. 46

Certificate of Service .......................................................................................... 49

Certificate of Compliance ................................................................................... 49

# Table of Authorities

Page(s)

**Cases:**

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
627 F.3d 547 (5th Cir. 2010) ........................................................10, 11

*Braidwood Mgmt., Inc. v. Becerra*,
104 F.4th 930 (5th Cir. 2024) .......................................................... 40

*Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*,
70 F.4th 914 (5th Cir. 2023) ............................................................ 9

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .......................................................11, 36

*Cargill v. Garland*,
57 F.4th 447, 470 (5th Cir. 2023),
*aff'd sub nom.*, 602 U.S. 406 (2024) ..............................................39-40

*Chamber of Com. of U.S.A. v. Consumer Fin. Prot. Bureau*,
No. 6:22-CV-00381, 2023 WL 5835951 (E.D. Tex. Sept. 8, 2023) ..................12

*Chem. Mfrs. Ass'n v. DOT*,
105 F.3d 702 (D.C. Cir. 1997) .....................................................33-34

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015) ..................................................................... 42

*Clark v. Scouffas*,
2000 U.S. Dist. LEXIS 633 (N.D. Ill. Jan. 18, 2000) ..........................27

*Collins v. Yellen*,
594 U.S. 220 (2021) ..................................................................... 16

*Connecticut Nat'l Bank v. Germain*,
503 U.S. 249 (1992) .....................................................................38

*Corley v. United States*,
556 U.S. 303 (2009) ..................................................................... 22

*Digit Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018) .....................................................................37

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................. 1, 31, 41

*El Paso County v. Trump*,
982 F.3d 332 (5th Cir. 2020) ...................................................... 14-16

*El Paso Elec. Co. v. FERC*,
    76 F.4th 352 (5th Cir. 2023) ............................................................ 36

*Ex parte Uniroyal Tire Co.*,
    779 So. 2d 227 (Ala. 2000) ............................................................. 18

*Exela Enter. Sols., Inc. v. NLRB*,
    32 F.4th 436 (5th Cir. 2022) ............................................................ 35

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
    695 F.3d 330 (5th Cir. 2012) ....................................................... 13, 14

*Hancock Cnty. Bd. of Supervisors*,
    487 F. App'x. 189 (5th Cir. 2012) .................................................... 12

*Harrison v. Young*,
    48 F.4th 331 (5th Cir. 2022) ............................................................. 6

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ...................................................................... 12, 13

*Katz v. United States*,
    389 U.S. 347 (1967) ......................................................................... 41

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ......................................................................... 40

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ......................................................................... 43

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ..................................................................... 40

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 7

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ............................................................................ 7

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ........................................................................ 41, 42

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
    116 F.4th 488 (5th Cir. 2024) .......................................................... 15

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ...............................................7-8, 12, 16

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) ......................................................................... 37

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................. 8, 9, 10

*Tenth St. Residential Ass'n v. City of Dallas, Texas*,
  968 F.3d 492 (5th Cir. 2020) ............................................................. 12

*Texas v. Rettig*,
  987 F.3d 518 (5th Cir. 2021) ............................................................... 7

*Texas v. United States*,
  691 F. Supp. 3d 763 (5th Cir. 2023) ........................................... 45, 46

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................. 7

*Trout Point Lodge, Ltd. v. Handshoe*,
  729 F.3d 481 (5th Cir. 2013) ............................................................. 38

*Turtle Island Foods, S.P.C. v. Strain*,
  65 F.4th 211 (5th Cir. 2023) ............................................................. 10

*United States v. Belmont*,
  831 F.3d 1098 (8th Cir. 2016) ........................................................... 17

*United States v. Biswell*,
  406 U.S. 311 (1972) ........................................................................... 42

*United States v. Brenner*,
  481 F. App'x 124 (5th Cir. 2012) ...................................................... 33

*United States v. Carter*,
  203 F.3d 187 (2d Cir. 2000) ....................................................... 17, 22

*United States v. Davis*,
  588 U.S. 445 (2019) ..................................................................... 42, 43

*United States v. Flores*,
  652 F.Supp.3d 796 (S.D. Tex. 2023) ................................................ 27

*United States v. Gross*,
  451 F.2d 1355 (7th Cir. 1971) ........................................................... 18

*United States v. Idarecis*,
  1998 U.S. App. LEXIS 25991 (2d Cir. Oct. 9, 1998) ....................... 32

*United States v. King*,
  735 F.3d 1098 (9th Cir. 2013) ........................................... 22-23, 25, 35

*United States v. Nadirashvili*,
  655 F.3d 114 (2d Cir. 2011) .......................................................... 22-23

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) ......................................................................... 1

*United States v. Shipley*,
  546 F. App'x 450 (5th Cir. 2013) ................................................. 25, 26

*United States v. Shirling*,
    572 F.2d 532 (5th Cir. 1978) ..................................................... 19, 25
*United States v. Strunk*,
    551 F. App'x 245 (5th Cir. 2014) ..................................................27
*United States v. Swinton*,
    521 F.2d 1255 (10th Cir. 1975) ......................................................23
*United States v. Tarr*,
    589 F.2d 55 (1st Cir. 1978) ...........................................................17
*United States v. Tyson*,
    653 F.3d 192 (3d Cir. 2011).......................................... 20, 26, 27, 32
*United States v. Valdes*,
    681 F. App'x 874 (11th Cir. 2017) .................................................26
*United States v. Wilmoth*,
    636 F.2d 123 (5th Cir. Unit A Feb. 1981)............................ 23, 25, 26
*Util. Air. Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)........................................................................25
*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ................................................... 40, 46
*Warth v. Seldin*,
    422 U.S. 490 (1975) .......................................................................10
*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................ 6
*Wis. Cent. Ltd. v. United States*,
    585 U.S. 274 (2018) ......................................................................44

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:
    amend II...................................................................1, 4, 6, 8, 31, 41
    amend IV ....................................................................... 4, 6, 41
    amend V ......................................................................... 4, 6, 42
    Article I, § 1 .................................................................................43
    Article I, § 7, cl. 2.........................................................................43
18 U.S.C.:
    § 921(a)(11) ...................................................................................18
    § 921(a)(13)...................................................................................31
    § 921(a)(21) .................................................................... 18, 21, 33

§ 921(a)(21)(C) ..................................... 3, 18, 19, 20, 24, 27-28, 29, 30, 31, 32

§ 921(a)(22) .................................................. 18, 20, 22, 24, 25, 31

§ 922(a)(1)(A) .......................................................................... 2, 39

§ 922(b)(3) ................................................................................... 35

§ 923(a) ........................................................................................... 2

§ 923(c) ......................................................................................... 39

§ 924(a)(1)(D) ............................................................................... 2

§ 926(a) ......................................................................................... 34

§ 1466 ............................................................................................ 35

§ 1469(a) ....................................................................................... 35

§ 3142(e)(2) .................................................................................. 35

§ 3571(b)(3) ..................................................................................... 2

27 C.F.R.:

§ 478.11 ......................................................................................... 31

§ 478.23(b) .................................................................................... 41

28 C.F.R. § 0.130(a)(1)–(2) ......................................................... 2

28 U.S.C.:

§ 1292(a)(1) ..................................................................................... 2

§ 1331 ............................................................................................... 2

§ 599A(b)(1) ..................................................................................... 2

§ 599A(c)(1) ...................................................................................... 2

35 U.S.C. § 282(a) ......................................................................... 35

38 U.S.C. § 1118 ............................................................................ 35

**Other Authorities:**

Act of July 8, 1986,
   Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986) ........................................ 3

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of
   Legal Texts, 174 (2012) ............................................ 20, 25, 28, 32, 39

*Black's Law Dictionary* (8th ed. 2004) ................................................ 17, 19

*Collection*, *Dictionary.com*, https://tinyurl.com/27jm8xf8 (last visited Nov.
   13, 2024) ........................................................................................ 29

Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480 (Mar. 31,
   1988) .............................................................................................. 34

Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed.
    Reg. 28968 (Apr. 19, 2024) .... 1, 4, 9, 15, 17, 19, 23, 28, 29, 33, 34, 35, 36, 38, 39,
    40, 42, 43

Firearms Owners' Protection Act,
    Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986) .................. 3, 22, 23, 25, 31

*Hoarders* (A&E 2009) ........................................................................... 29

*Necessary*, *Merriam-Webster*, https://tinyurl.com/mr4cdcnz (last visited
    Nov. 13, 2024) .................................................................................. 34

Proposed Rule, 88 Fed. Reg. 61999 (2023) ............................................ 38

*Repetition*, *Merriam-Webster*, https://tinyurl.com/mun5hawv (last visited
    Nov. 14, 2024) .................................................................................. 18

*Resale*, *Cambridge Dictionary*, https://tinyurl.com/mrxspent (last visited
    Oct. 28, 2024) ................................................................................... 19

S. Rep. No. 98-583 (1984) ................................................... 3, 22, 23, 28

# Introduction

The right to keep and bear arms is bedrock law. The Second Amendment "does not merely narrow the Government's power. It is a barrier, placing the right to keep and bear arms off limits to the Government." *United States v. Rahimi*, 144 S. Ct. 1889, 1931 (2024) (Thomas, J., dissenting). Despite this, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") seeks to regulate law-abiding American gun owners by classifying them as arms dealers, subjecting almost any individual who sells—or wishes to sell—a firearm to federal licensing requirements. ATF's rule—Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28968 (Apr. 19, 2024) ("the Rule")—does not simply "implement" a recent "statutory change and provide clarity to persons who remain unsure of whether they are" arms dealers in the eyes of Congress, 89 Fed. Reg. at 28968. Rather, the Rule usurps broad authority for ATF and restricts private firearms transactions. Congress, recognizing that the "enshrinement of constitutional rights necessarily takes certain policy choices off the table," *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008), chose not to go so far. ATF, a creature of statute, must adhere to that decision.

ATF claims that "[t]his rule does not prevent law-abiding persons from purchasing or possessing firearms, from selling inherited firearms, or from using their personal firearms for lawful purposes." 89 Fed. Reg. at 28995. That promise is "cold comfort." ROA.998. Instead, the Rule prevents law-abiding persons from selling even one firearm when they hope to make some extra cash without first acquiring a federal license. Nor does the Rule clarify or "assist persons in understanding when they are required to have a license." 89 Fed. Reg. at 28968. It wrests power from

Congress while categorizing thousands of law-abiding, private individuals as firearms dealers. It logically follows that those who are affected—the individuals, their associations, and the States—have standing to challenge ATF's unlawful Rule.

## STATEMENT OF JURISDICTION

The district court, having jurisdiction under 28 U.S.C. § 1331, ROA.20, entered a preliminary injunction on June 11, 2024, ROA.1010. Appellants filed a timely notice of appeal on July 2, 2024. ROA.1016-17. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.   Whether Appellees have standing to challenge the Rule.
2.   Whether the Rule violates the Administrative Procedure Act.

## STATEMENT OF THE CASE

### I.   Statutory History

The Gun Control Act of 1968 ("GCA") requires those "engage[d] in the business" of dealing firearms to be licensed by the Attorney General. 18 U.S.C. § 923(a). ATF oversees the administration and enforcement of this law. *See* 28 U.S.C. § 599A(b)(1), (c)(1); 28 C.F.R. § 0.130(a)(1)–(2). Willfully engaging in the business of dealing firearms without a license can result in harsh punishment, including a fine of up to $250,000 or up to five years imprisonment—or both. 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D), 3571(b)(3).

The phrase "engaged in the business" of dealing firearms went largely undefined by statute or rule until 1986, when Congress passed the Firearms Owners'

Protection Act ("FOPA"). Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986). In FOPA, Congress "substantially narrow[ed]" the GCA's reach by providing a specific definition of what it meant to be "engaged in the business." S. Rep. No. 98-583, at 8 (1984) ("Senate Report"). More specifically, FOPA defined those who are "engaged in the business" as any "person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 100 Stat. at 450. FOPA's definition specifically excluded any "person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or hobby, or who sells all or part of his personal collection of firearms." *Id.* FOPA was soon amended thereafter, clarifying that proof of profit was not required "as to a person who engages in the regular and repetitive purchase and disposition of firearms for *criminal purposes or terrorism.*" Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986) (emphasis added).

In 2022, Congress passed the Bipartisan Safer Communities Act ("BSCA"), which amended the definition of what it meant to be "engage[d] in the business" of firearms dealing. The BSCA replaced the "principal objective of livelihood and profit" requirement with a requirement that a dealer act "to predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C). But the BSCA did not alter or amend FOPA's specific language referencing a regular course of trade or business or the repetitive purchase and resale of firearms, nor did it change FOPA's exclusion for those individuals who make occasional purchases or sales of firearms pursuant to a personal collection. 18 U.S.C. § 921(a)(21)(C); *see* ROA.991.

## II.  Regulatory History

Two years after enactment of the BSCA, ATF promulgated the Rule. 89 Fed. Reg. at 28968. Per ATF, the Rule implemented the BSCA's statutory changes and "provide[d] clarity to persons who remain[ed] unsure" of whether they were engaged in the business of firearm dealing with a "predominant intent of obtaining pecuniary gain." *Id.* The Rule did so by, *inter alia*, redefining clauses such as "dealer," "engaged in the business," "predominantly earn a profit," "personal collection," and "responsible person." *Id.* at 28972. It also asserted that "a single firearm transaction or offer to engage in a transaction" may require a firearms license. *Id.* at 29091. And despite promising that the Rule will not "require every private sale of a firearm to be processed through a licensed dealer," ATF proclaimed that the Rule "will result in more persons . . . becoming licensed and deter others from engaging in the business of dealing in firearms without a license." *Id.* at 28968.

## III. Procedural History

On May 1, 2024, Appellees filed suit against ATF; Steven Dettelbach, Director of ATF, in his official capacity; the United States Department of Justice; and Attorney General Merrick Garland in his official capacity. ROA.22-23. Appellees alleged that the Rule (1) contravenes the BSCA; (2) exceeds ATF's statutory authority; (3) is arbitrary and capricious; (4) is an abuse of discretion; (5) violates the Second, Fourth, and Fifth Amendments; (6) and violates the separation of powers. The district court first granted Appellees' motion for a temporary restraining order, ROA.764, and, after supplemental briefing on standing, granted Appellees' motion for preliminary injunction, ROA.1010. Appellants then appealed. ROA.1016.

# Summary of the Argument

ATF cannot upend the will of Congress. No policy goals or "clarity" can change that. The district court enjoined ATF from enforcing its attempt to do so, finding that Appellees are likely to succeed on the merits of their claims, face an irreparable injury from enforcement, and are favored by the equities. This Court should affirm.

First, all Appellees have standing to bring suit. Jeffrey Tormey, an individual who suffers from a real, substantial threat of enforcement of the Rule, can challenge whether his status as a lawful gun owner should subject him to punishment. GOA, TFA, and VCDL, the associational Appellees, have standing because their members, including Tormey, have standing. Thus, all three associations may seek to protect the collective interests of their members. Likewise, GOF, which is not a traditional association, has standing because it contains indicia of membership sufficient to provide a means by which its supporters can assert their collective views. Finally, all State Appellees have standing. Each has suffered a quintessential injury—an economic injury. Such injury is not asserted on behalf of their citizens, nor is it speculative or based on third-party actions. Because the Rule has directly harmed each Appellee, each has standing to bring its claims.

Second, Appellees are likely to succeed on the merits because the Rule vastly departs from the text Congress enacted. For example, the Rule repudiates the requirement that a firearm is *actually* sold before being engaged in the business of firearm dealing. Similarly, the Rule denies the importance of actual profit gain from any such transaction. Moreover, the Rule destroys Congress' statutory safe-harbor provision and flips the statutory burden of proof, presuming perfectly innocuous

conduct to be evidence of criminal activity. The Rule is also unlawful on grounds unreached by the district court: it exceeds ATF's authority, is exceedingly vague, and violates Appellees' Second, Fourth, and Fifth Amendment rights.

Finally, the equitable factors concerning a preliminary injunction all support Appellees. And to the extent Appellants argue that the district court's relief was overbroad, such relief was necessary to maintain the status quo and protect Appellees' rights. This Court should affirm on all grounds.

## Standard of Review

This Court "review[s] the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022). A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" *Id.* at 342 (citation omitted). A plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## Argument

## I.   All Appellees Have Standing to Assert Their Claims.

Appellees have sufficiently proven they have standing to challenge the Rule. Standing has three requirements: (1) an "injury in fact;" (2) a sufficient "causal

connection between the injury and the conduct complained of;" and (3) a likelihood "that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted). "To obtain forward-looking relief," Appellees "must establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them." *Murthy v. Missouri*, 603 U.S. 43, 69 (2024). But "the manner and degree of evidence required to show standing is less" at earlier stages of litigation. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020). Thus, Appellees need only show "that they are likely to succeed in carrying" their burden of establishing standing. *Murthy*, 603 U.S. at 69. And so long as "one plaintiff has standing for a claim, then Article III is satisfied as to all plaintiffs." *Texas v. Rettig*, 987 F.3d 518, 528 (5th Cir. 2021).

At this preliminary stage, Appellees have each demonstrated that they have a "personal stake" in the litigation sufficient to establish standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The district court agreed, ROA.1003, and this Court should not disturb that conclusion.

## A. Tormey has standing.

Tormey's standing turns on whether Tormey can establish an Article III injury in this pre-enforcement suit. Appellants' Br. at 13-18. The clear answer is yes. Tormey has established that he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably . . . proscribed by [the policy in question]," and (3) "the threat of future enforcement of the [challenged policies] is substantial." *See Fenves*, 979 F.3d at 330

(alterations in original) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-64 (2014)). As "an avid gun owner and supporter of the right to keep and bear arms," ROA.456-57, Tormey need not wait until ATF subjects him to "a threat, an actual arrest, prosecution, or other enforcement action" before challenging the Rule, *see Susan B. Anthony List*, 573 U.S. at 158. Tormey easily satisfies these requirements.

First, the record demonstrates Tormey's intent. Tormey submitted two declarations to the district court, both of which exemplify his intent "to engage in a course of conduct arguably affected with a constitutional interest." *Id.* 573 U.S. at 161; ROA.456-59, 787-89. In his first declaration, Tormey states that he enjoys collecting guns, attending gun shows, and engaging in regular shooting activities. ROA.457. He states that, despite never having held a federal firearms license, he has "bought, sold, and traded firearms at various times and for various reasons." ROA.457. By his estimation, he has sold "at least a couple, or even several, firearms per year, through various mediums, for a number of years." ROA.457-58.

Tormey's second declaration further shows his intent to engage in such conduct. For example, Tormey describes how he engages in "buying and selling firearms through private sales, from time to time." ROA.788. He also states that he has "sold firearms and in the future plan[s] to sell firearms in an effort to upgrade and enhance [his] collection of self-defense firearms." ROA.789. These plans concern Tormey's Second Amendment right to bear arms, meaning they are "certainly affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 162 (quotations omitted).

Second, Tormey's conduct is proscribed by the Rule. For example, Tormey has stated that he plans to sell firearms in the future to upgrade his personal collection

of self-defense firearms. ROA.789. But rejecting that this conduct falls within the safe-harbor provision of the statute, the Rule claims that "personal collections" do not include firearms accumulated for personal protection. 89 Fed. Reg. at 29090; ROA.1006. This subjects not only Tormey's conduct to the Rule, it "*provides no safe harbor at all* for the majority of gun owners." ROA.1006-07 (emphasis in original). And when "even a single firearm transaction or offer to engage in a transaction" may constitute "engaging in the business," of dealing firearms, Appellants cannot credibly deny that Tormey falls in the heartland of the Rule. 89 Fed. Reg. at 29091.

Appellants' counterarguments are unconvincing. Appellants point to Tormey's declaration to argue that he is a collector, hobbyist, and occasionally engages in gun sales to enhance his firearms collection. This conduct, they contend, does not require licensure. Thus, with no obligation to obtain a license Tormey faces no prospect of enforcement. But for the reasons described, *infra* at 27-33, that cannot be true. Nor did the district court agree with Appellants' arguments. ROA.998. Tormey's future conduct is proscribed by the Rule. And "[n]othing . . . requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List*, 573 U.S. at 163.

Third, the threat of enforcement against Tormey is substantial. "[E]valuating threats against our most cherished rights cannot be neatly reduced to a rigid formula." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 928 (5th Cir. 2023). Rather, determinations of threats of future enforcement are typically fact and case specific. *Id.* But "even a public announcement to enforce a statute and one prior proceeding are sufficient for standing." *Id.* (cleaned up). And like the

district court noted, this case has both. ROA.998. This prior action by ATF, combined with Tormey's future conduct, shift any "imaginary or speculative" enforcement of the Rule into a substantial, imminent threat. *Susan B. Anthony List*, 573 U.S. at 165.

Appellants contend (at 16) that, "for much the same reason" Tormey's conduct is not proscribed, any threat of enforcement against him is not substantial. Appellants' argument centers around one assumption: that ATF will not later deem Tormey to be a lawbreaker. *See* Appellants' Br. at 27. But ATF's "disclaimed intent to penalize" Tormey is not helpful to its cause. *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218 (5th Cir. 2023). "And besides, nothing binds the [ATF] here" from changing its mind and deciding that Tormey has engaged in the business of dealing firearms and must be licensed. *Id.* Like the district court noted, ATF's statements are "cold comfort" to a lawful gunowner, like Tormey, who decides to sell his firearms for cash. ROA.998. Because Tormey suffers from a threat of enforcement of the Rule against him, he has standing to challenge it now. *See* ROA.997-99.

### B.  The associations have standing.

All Appellee associations—GOA, GOF, TFA, and VCDL—have standing to challenge the Rule on behalf of their members. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)) ("[I]n the absence of an injury to itself, an association may have standing solely as the representative of its members"). "Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are

germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 233-34 (5th Cir. 2024) (citation omitted). The associations satisfy each part of the test.

### 1. GOA, TFA, and VCDL have standing.

GOA, TFA, and VCDL all have standing to sue as associations. *See Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 550. Appellants argue that the associations fail to identify a member who has standing. Appellants' Br. at 19. Appellants believe that even putting aside the naming issue makes no difference—Appellees' members do not have standing because none expresses an intent to engage in conduct that would require a license. Appellants' Br. at 20. Both arguments fail for the same reason: Tormey, a member of each association, has standing. ROA.999-1003. Tormey is a named individual and has expressed an intent to engage in conduct proscribed by the Rule. *Supra* 7-9. Appellants cannot subvert this conclusion by stating that Tormey "cannot serve as the basis for the association[s'] standing." Appellants' Br. at 19.

And in addition to Tormey, the associations have demonstrated standing through other members. First, GOA identified a former-FFL who cannot sell his accumulated firearms, which largely constitute his retirement savings, for fear of being labeled a dealer under the Rule. ROA.465-66. GOA also identified Robert Arwady, a member who was prosecuted as a "former licensee" for selling personally transferred firearms. ROA.467-68. TFA and VCDL provided similar information. *See* ROA.796-800 (naming C. Richard Archie as a director and member of TFA who faces concerns over the Rule, and naming and discussing six other TFA members as

individuals who will be affected by the Rule); ROA.472 (discussing how TFA members "will be impacted because they have bought and resold firearms, and wish to do so in the future"); ROA.835-838 (discussing two members who either credibly fear enforcement of the Rule or express confusion regarding the obligations it imposes); ROA.477 (highlighting how "scores of [VCDL] members and supporters" have bought and resold firearms in the past and "wish to do so in the future" without being "labeled as a 'dealer'"). These identifications, along with Tormey's membership, are far more than sufficient to establish the associations' standing to represent their aggrieved members. *Tenth St. Residential Ass'n v. City of Dallas, Texas*, 968 F.3d 492, 500 (5th Cir. 2020) (explaining that associations must show "that the individual members of the group each have standing and that the interest the association seeks to protect be germane to its purpose") (quotations and citations omitted).

Appellants' contention that identified members must be named members is wrong. Indeed, as the district court explained, this Circuit has no such requirement. ROA.1002 (citing *Hancock Cnty. Bd. of Supervisors*, 487 F. App'x. 189, 195 (5th Cir. 2012); *Fenves*, 979 F.3d at 335; *Chamber of Com. of U.S.A. v. Consumer Fin. Prot. Bureau*, No. 6:22-CV-00381, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8, 2023)). Appellants offer no caselaw to support their contrary position. Rather, to require the naming of and participation by those being represented by their associations would eviscerate the concept of representational standing, which permits litigation "on behalf of" others. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Accepting Appellants' point would also require looking past the sworn declarations of those who have chosen to be named. Here, where all three associations have

identified members—like Tormey—and described the injuries they will suffer under the Rule, the associations may sue on behalf of the collective interests of their members.

### 2. GOF has standing.

GOF—although "not a traditional membership association"—is no different: it has standing to challenge the Rule. ROA.824. Although GOF "does not have traditional members," it can establish "its standing by proving that is has 'indicia of membership,'" by showing that its members engage in associational aspects, like "elect[ing] leadership, serv[ing] as the organization's leadership, and financ[ing] the organization's activities, including the case's litigation costs." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012). Importantly, GOF "must represent the individuals it claims as members and provide 'the means by which [those individuals] express their collective views and protect their collective interests.'" *Id.* (quoting *Hunt*, 432 U.S. at 345).

Such indicia of membership are present in the record. But rather than proving indicia of membership by "members elect[ing] leadership" or "serv[ing] as the organization's leadership," *id.*, GOF proved that supporters exert control through the power of the purse. For example, in the complaint, GOF describes itself as a "non-profit legal defense and educational foundation" that "is supported by gun owners across the country, who fund the organization's activities," which include "litigation such as this to preserve, protect, and defend their right to keep and bear arms." ROA.21. This fits squarely within *Funeral Consumers Alliance*'s financial showing and demonstrates GOF's representative nature as a means by which its supporters

13

can "express their collective views and protect their collective interests." *Funeral Consumers All.*, 695 F.3d at 344 n.9. The declaration of Erich M. Pratt, GOF's senior Vice President, further confirms the influence GOF's supporters' hold over the association. In his declaration, Pratt describes how "supporters contribute to GOF specifically so that [it] can bring litigation like this." ROA.818. In fact, "[m]any have donated to GOF specifically in order to fund *this* litigation." ROA.818 (emphasis added). Without donations from GOF's supporters, the litigation efforts by GOF "would be impossible." ROA.818.

Appellants' arguments to the contrary are meritless. Per Appellants, "GOF does not contend that its supporters elect its leadership or serve in those leadership positions, or indeed exert any formal control over GOF's activities." Appellants' Br. at 34. The district court dealt with this, finding that GOF has associational standing for the same reasons discussed above. *See supra* at 13-14; ROA.1001 (highlighting that GOF's supporters receive regular updates on its activities, communicate their views to GOF, and provide all GOF's funding). Moreover, Appellants' contention that GOF's supporters "exercise no meaningful control over the organization" overlooks the financial control they have. Appellants' Br. at 35. GOF's supporters exercise the *most* meaningful control over GOF's operations—its funds. This control, combined with the indicia of membership cited by the district court, "suffice for GOF's associational standing." ROA.1001.

## C. The States have standing.

The State-Appellees have suffered "a quintessential injury upon which to base standing," an economic injury. *El Paso County v. Trump*, 982 F.3d 332, 338 (5th Cir.

2020) (citation omitted). In Texas, the Rule will reduce the number of people who buy and sell firearms and harm the State's economy—effects that are already being realized. ROA.870-71.

Nor is this injury asserted on behalf of the citizens of each State. ROA.870-71 Rather, implementation of the Rule will directly reduce gun show attendance and sales and thereby reduce tax revenue, meaning "each State will sustain financial losses." ROA.994. The record provides ample discussion of this. *See* ROA.851-857; 869-883; 890-91; 923-932 (declarations and States' supplemental briefing on standing). Each State, through its declarations, described the loss in revenue generated from gun shows. And the district court found that enjoining this Rule "will redress that injury." ROA.995.

Appellants argue that the States' theories "depend entirely on the actions of third parties." Appellants' Br. at 25. This argument fails to consider the district court's analysis. "This [harm] is not speculative," ROA.994, and it is not "an indirect result of federal policy," *El Paso County*, 98 F.3d at 339. The Rule anticipates the effects. ROA.994; *see* 89 Fed. Reg. at 29054. A portion of currently unlicensed sellers will be unable or unwilling to become licensed. 89 Fed. Reg. at 29054. Accordingly, they will be forced from the marketplace. And but for the Rule, the States would not suffer a loss to their fiscs since these unlicensed sellers and potential buyers would continue to engage in firearms sales. Even assuming Appellants are correct, these third-party decisions are "guided by basic economic rationality." *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 500 (5th Cir. 2024). Gun show enthusiasts will "react in predictable ways," and tax revenue will suffer because of it. *Id.*

Moreover, Appellants cannot cite to *El Paso County*. There, the county asserted "that the economy . . . at large will be harmed." *El Paso County*, 982 F.3d at 340. But the States are not claiming that type of generalized injury. Rather, the States are complying with caselaw by identifying "the loss of a specific tax revenue," which "is necessary to demonstrate standing." *Id.*; ROA.996 ("Those tax revenues include, first and foremost, the sales and use taxes levied against firearms transactions (both at gun shows and via e-commerce)—but also" other taxes). This is not the denial of a yet-be-received economic benefit, *see El Paso County*, 982 F.3d at 339, but a direct injury upon the States' pocketbooks, *see Collins v. Yellen*, 594 U.S. 220, 243 (2021). Each State has shown standing, especially at this stage of the litigation. *See Fenves*, 979 F.3d at 330.

## II. Appellees Are Likely to Succeed on the Merits.

Minimizing the Rule's sweeping nature, Appellants assert that it merely follows certain caselaw and longstanding agency practice. Appellants' Br. at 33. But Appellants omit that their cases predate (or rely entirely on analysis predating) FOPA, when Congress "substantially narrow[ed]" the statute's reach by enacting a specific definition for the theretofore undefined phrase "engaged in the business." Senate Report at 8. How the district court erred by rejecting cases *decided before the statute was enacted*, Appellants do not say. Nor can Appellants otherwise cure the Rule's defects so long as it undermines Congressional intent. Indeed, while the Rule adopts a regulatory scheme ATF *prefers* to enforce, it bears little relation to the one Congress enacted. The district court was correct to preliminarily enjoin ATF's statutory rewrite, and this Court should affirm.

### A. The statute requires actual purchases and resales of firearms.

The statutory text forecloses the Rule's suggestions that "there is no minimum number of transactions that determines whether a person is 'engaged in the business,'" and that "[e]ven a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." 89 Fed. Reg. at 28976. Contrary to ATF's claim that a person can be "engaged in the business" without consummating any *actual* business, the statute contains numerous indicators that more is required.

First, the phrase "dealing in firearms" denotes commercial activity. A "deal" means "to transact business . . . the purchase and exchange of something for profit," while a "dealer" is "a person who purchases goods or property for sale to others, a retailer." *Black's Law Dictionary* at 427 (8th ed. 2004).

Second, with respect to being "engaged in the business," a "business" means "commercial transactions," and "engage" means "to take part in." *Black's Law Dictionary* at 211, 570. In other words, to "engage in the business," one must "take part in commercial transactions," the very thing Appellants claim is *not* required. *See United States v. Belmont*, 831 F.3d 1098, 1102 (8th Cir. 2016) ("the term 'engaged in the business'" in 18 U.S.C. § 842 "impl[ies] an element of continuity or habitual practice as against a single act or occasional participation"); *United States v. Tarr*, 589 F.2d 55, 59 (1st Cir. 1978) ("[t]he words 'to engage in the business of' strongly imply more than one isolated sale or transaction," and "'dealing' connotes a regular course of conduct carried on over a period of time or, at least, on more than one or two unrelated occasions."); *United States v. Carter*, 203 F.3d 187, 191 (2d Cir. 2000)

(same). Both "dealing" and "engaging" are words of action, not planning. The statute does not say "engages *or intends to engage* in the business."

Third is the statutes' repeated use of the word "firearms" in the plural, 18 U.S.C. §§ 921(a)(11), (21), (22), clearly contemplating more than one firearm transaction, and certainly more than zero.

Fourth, the statute requires a "regular course of trade or business," 18 U.S.C. § 921(a)(21)(C), referring to a series of events demonstrating an overarching business purpose and mindset. *See*, *Ex parte Uniroyal Tire Co.*, 779 So. 2d 227, 236 (Ala. 2000). In contrast, isolated events—like a mere offer to sell or even a single transaction—do not evince regularity or a course of business. *See United States v. Gross*, 451 F.2d 1355, 1358 (7th Cir. 1971) ("a single isolated sale did not constitute engaging in the 'business.'").

Fifth, the "repetitive purchase and resale of firearms" (18 U.S.C. § 921(a)(21)(C)) means more than once, "the act or an instance of repeating" something "such as a push-up" that is "usually counted."[1] Doing a single pushup is not repetitive; nor does it evince that a person is engaging in exercise. Talking about doing pushups provides even less evidence still. *See Gross*, 451 F.2d at 1358 ("The reasonable reader would conclude that . . . a single isolated sale did not constitute engaging in the 'business.'").

---

[1] *Repetition*, *Merriam-Webster*, https://tinyurl.com/mun5hawv (last visited Nov. 14, 2024).

Sixth, the statute requires the repetitive "purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). Firearms must be purchased *and* resold—a conjunctive requirement—a far cry from the Rule's claim that there is no "minimum number of firearms purchased *or* resold that triggers the licensing requirement." 89 Fed. Reg. at 28976 (emphasis added); *cf. United States v. Shirling*, 572 F.2d 532, 533 (5th Cir. 1978) (concluding, prior to FOPA, that "Congress didn't say anything about buying," so "you can be a dealer just by selling.").

Seventh, the statute does not require "purchases" followed by mere "sales," something any gun owner might do. Rather, "resale," means "the act of selling something again" such as "buying used cars for resale."[2] Necessarily embedded within the word "resale" is a contemporaneity requirement, linking purchases and resales within a short enough timeframe to reasonably constitute business activity. Rejecting this principle, the Rule considers both the collector (who sells a firearm after 20 years) and the would-be dealer (seeking to flip firearms for a quick profit) to be "resellers." 89 Fed. Reg. 29090. But the statute treats "sales" and "resales" differently, expressly protecting "occasional sales" and "exchanges" of firearms "for the enhancement of a personal collection or for a hobby," in addition to those who "sell[] all or part of [a] personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). Congress's deliberate choice of "resale" must mean something.

---

[2] *Resale*, *Cambridge Dictionary*, https://tinyurl.com/mrxspent (last visited Oct. 28, 2024); *see also Black's Law Dictionary* at 1332 ("a retailer's selling of goods, previously purchased from a manufacturer or wholesaler").

*See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 174 (2012) ("every word and every provision is to be given effect.").

Eighth, the statutory safe harbor protects "occasional sales, exchanges, or purchases of firearms" for certain purposes. 18 U.S.C. § 921(a)(21)(C). Each of these terms is plural, accommodating multiple sales, multiple exchanges, and multiple purchases without rising to the level of "dealing." Congress acknowledged as much: "[m]any firearm hobbyists sell or trade firearms from their collections." Senate Report at 8.

Ninth, the statutory definition of "to predominantly earn a profit" describes "the intent underlying the sale or disposition of firearms." 18 U.S.C. § 921(a)(22). The statute therefore *requires* sales and dispositions which *actually* occur, or else Congress would have said "the intent underlying the [*intended or proposed*] sale or disposition." *See United States v. Tyson*, 653 F.3d 192, 200-01 (3d Cir. 2011) (explaining objective underlying "the repetitive purchase and resale of firearms.").

The district court rightly concluded that "the Final Rule clashes with the text" by asserting that a person can be "engaged in the business" without transacting in multiple firearms or engaging in any transaction at all. ROA.1004. Indeed, the statute "severely undercut[s]" Appellants' reading, repeatedly employing plural, sequential, and conjunctive language of action which "flatly contradicts" the notion that one may deal in firearms without ever completing a transaction. ROA.1004-07 (identifying five of the above nine reasons that the Rule had departed from the statutory text). Each reason on its own requires affirmance. Combined, they render the Rule fatally atextual.

Appellants offer no cogent reason to disturb the district court's conclusion. Noting that "federal law does not set a numerical threshold for the number of firearms . . . or the number of transactions" Appellants surmise that a person can be "engaged in the business of selling firearms" "even if they have not yet sold a firearm." Appellants' Br. at 34. For Appellants, "the licensing requirement *focuses on a person's intent* . . . regardless of whether they have actually" engaged in any business. *Id.* (emphasis added). To arrive at this conclusion—that a person can be "engaged in the business" without "engaging" in any "business," Appellants misconstrue what they term the "structure of the definition." *Id.* at 37. Asserting that the prepositional phrase "'[through the] repetitive purchase and resale of firearms' . . . describe[s] how a person *intends* 'to predominantly earn a profit'" (at 37-38), Appellants consider the phrase to modify only the immediately preceding phrase "to predominantly earn a profit." On the contrary, Section 921(a)(21)'s three subsidiary phrases *each* describe how a person engages in dealing in firearms:

(i) he must deal in firearms "as a regular course of trade or business";

(ii) he must deal in firearms "to predominantly earn a profit"; and

(iii) he must deal in firearms "through the repetitive purchase and resale of firearms."

And, of course, (iv) he must deal in firearms by "devot[ing] time, attention, and labor" to the business. *Id.*

Each phrase links back to the ultimate inquiry—whether a person is "dealing in firearms." If the phrase "through the repetitive purchase and resale of firearms" was meant to inform only the immediately prior phrase "to predominantly earn a

profit," Congress would not have redundantly included a second definition of "to predominantly earn a profit" in Section 921(a)(22). *See Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up) ("effect is given to all [statutory] provisions, so that no part will be inoperative or superfluous, void or insignificant").

Undaunted, Appellants claim that caselaw confirms their construction, because "[c]ourts have recognized . . . for decades" that a person can be "engaged in the business" without engaging in any actual transactions of firearms. Appellants' Br. at 36. But Appellants' first three cases were decided *before* Congress defined "engaged in the business" in FOPA. *Id.* (citing cases from 1975, 1981, and 1986[3]). It is difficult to see how these decisions inform interpretation of statutory language they predate. Appellants' two remaining cases are unhelpful, because they relied entirely on pre-FOPA cases. *See United States v. Nadirashvili*, 655 F.3d 114 (2d Cir. 2011) (citing pre-FOPA cases); *United States v. King*, 735 F.3d 1098 (9th Cir. 2013) (citing *Nadirashvili*). None of Appellants' authorities interpret the current statutory text.

But the problem with Appellants' cases is not merely one of age. Rather, Congress explicitly intended that FOPA's definition of "engaged in the business" would "substantially narrow" the existing body of caselaw—thus rejecting both lines of precedent that had developed in the federal courts. *See* Senate Report at 8; ROA.25-26 (summarizing divergent pre-FOPA judicial tests). In fact, Congress expressly stated in FOPA that it intended to "substantially narrow" the broad standard in

---

[3] Although the Second Circuit's decision came the same year FOPA was enacted, the court declined to "apply ... retroactively" the new definition. *United States v. Carter*, 801 F.2d 78, 83 (2d Cir. 1986).

*United States v. Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975). Senate Report at 8 n.18. Likewise, the proposition in *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A Feb. 1981), that a person is "engaged in the business" if he "has guns on hand or is ready and able to procure them," was specifically enumerated and then expressly repudiated. *Id.* at 8 (FOPA "would substantially narrow these broad parameters"). Moreover, *Nadirashvili* effectively wrote the livelihood requirement out of the statute and *King* relied on pre-FOPA standards that now run in tension with the statute. It was not error for the district court to "not engage with" these decisions. Appellants' Br. at 37.

Unabashedly, the Rule acts as if FOPA was never enacted, continuing to rely on repudiated standards from pre-FOPA decisions. *See* 89 Fed. Reg. at 28971, 28977, 29021, 29022 (citing cases adopting the *Wilmoth* "guns on hand" standard), 29091 (adopting a presumption for someone who "demonstrates a willingness and ability to purchase and resell additional firearms"). Indeed, Appellants claim broadly that "the Rule straightforwardly implements this [pre-FOPA] understanding" of various courts. Appellants' Br. at 36; *see also* at 37 (the Rule "rel[ies] on many of the [pre-FOPA] cases."). But Appellants fail to acknowledge they rely on a line of cases that Congress expressly rejected—*i.e.*, evidence of what the statute does not mean.

## B. The statute requires actual profit.

Rejecting the assertion that the statute requires licensure when a person merely desires to earn a profit from selling guns "but never actually find[s] a buyer," 89 Fed. Reg. at 29045, the district court explained that a person must engage in resales of firearms and net profit to be "engaged in the business." ROA.1005. Section

921(a)(22) specifically instructs that "proof of profit shall not be required" in cases of "criminal purposes or terrorism," and thus "[t]he negative corollary is obvious . . . proof of profit . . . *is* required for all other cases." *Id.* Indeed, the fact that Section 921(a)(22) defines intent "does not necessitate—or even suggest—that intent is *all* that is required. Rather, the Section's usage of 'intent' serves to distinguish the *type* of intent contemplated . . . [a]ction is needed, too." ROA.1005.

Appellants disagree. Requiring no sale, they conclude that profit is similarly unnecessary. *See* Appellants' Br. at 37-38. Focusing entirely on the word "intent" appearing in Section 921(a)(22)'s definition of "to predominantly earn a profit," Appellants assert that "the requirement to obtain a license may attach even before a sale has been consummated (and thus before any profit has been realized)." *Id.* at 38-39. Not so. The text requires that a person be "dealing . . . through the repetitive purchase and resale of firearms" "to predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C). Rather than undermining this reading, Section 921(a)(22) reinforces it, describing "the intent *underlying the sale or disposition*"—a definite article describing an actual event, not a *planned*, *anticipated*, *attempted*, or *hoped* sale or disposition. Section 921(a)(22) describes *actual* firearm resales, delineating between those who sell guns seeking "pecuniary gain" and those with "other intents, such as improving or liquidating a personal firearms collection."

Appellants fail to rebut the "negative-implication canon," wherein "the thing specified . . . can reasonably be thought to be an expression of all that shares in the

grant or prohibition involved." [4] Instead, Appellants offer a statutory rewrite. Asserting that "the statute eliminates *the intent requirement* for particular bad actors," Appellants claim that the statutory language "proof of profit" means "*i.e.*, proof of *intent to* profit." Appellants' Br. at 39 (emphases added). But that is not what the statute says. Rather, the statute eliminates the profit requirement, stating that "proof of profit shall not be required" in certain cases. 18 U.S.C. § 921(a)(22). If the statute needed additional words to mean what Appellants claim, that is good evidence that the statute does not mean what they say. *See Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[T]he need to rewrite clear provisions of the statute should have alerted [the agency] that it had taken a wrong interpretive turn."). If proof of actual profit is never required in any case, then why would Congress specifically exempt "criminal purposes [and] terrorism" from the profit requirement? *See Reading Law* at 174. And if what Congress really meant by "proof of profit" was "proof of *intent to profit*," why did Congress not say that?

Appellants claim that precedent confirms their position. Appellants' Br. at 39-40. But Appellants again rely on *King* and *Wilmoth*, pre-FOPA cases which are inapplicable. *Supra* 22-23. Appellants also cite *United States v. Shipley*, 546 F. App'x 450 (5th Cir. 2013), but fail to note that it was an unpublished opinion and is "not precedent" (*id.* at 452 n.*) and nonbinding. Moreover, *Shipley* provides scant reason to adopt the government's position here, having relied on pre-FOPA *Wilmoth*.[5] Not to

---

[4] *See Reading Law* at 107.

[5] *Wilmoth*, in turn, cited to *Shirling*, 572 F.2d at 533, which explained that "the [then-existing] definition doesn't say anything about making a profit. You can be a

mention Shipley had both transactions and profit—he "began dealing in firearms . . . to supplement his lawful income," and he "engaged in a regular course of dealing firearms for profit for a number of years." *Id.* at 452, 454 (finding that "[t]he jury . . . was entitled to disbelieve [Shipley's] evidence" that he had "suffer[ed] a net loss"). In a single sentence, the Court opined (without analysis) that the statute "does not require that [a defendant] succeeded in" making a profit. *Id. Shipley* certainly conducted no comprehensive statutory analysis like the district court provided, and its reliance on pre-FOPA cases undermines its conclusion.

Appellants next cite to *United States v. Valdes*, 681 F. App'x 874 (11th Cir. 2017), another unpublished opinion which relied entirely on *Wilmoth*'s pre-FOPA analysis. Moreover, *Valdes* made actual sales netting her actual profit, "600 [firearms] in 7 years," to be precise. *Id.* at 878. And *Tyson*, 653 F.3d 192, is an even more slender reed. There, the Third Circuit noted that "a defendant engages in the business of dealing in firearms when his principal motivation is economic (*i.e.*, 'obtaining livelihood' and 'profit') *and he pursues this objective* through the repetitive purchase and resale of firearms." *Id.* at 200 (emphasis added). In other words, *Tyson* supports Appellees' position that the statute requires *actual* sales leading to *actual* profit. Indeed, Tyson "purchas[ed] a significant quantity of firearms in his home state . . . and then transport[ed] those weapons . . . for resale," keeping records with "columns labeled 'Spent' and 'Profit'"—making $1,500 profit from selling an "AK," and $1,300

---

dealer in firearms and sell them for less than you paid for them."  FOPA rejected this holding.

profit from selling an "AR." *Id.* at 195, 198-99. *Tyson* hardly supports Appellants' notion that no profit is required.

Faulting the district court for "not engag[ing] with" these pre-FOPA, unpublished, and/or unreasoned dicta cases, and instead "focus[ing] solely on the text," Appellants claim that "no court has suggested that . . . an actual profit is required for other sales." Appellants' Br. at 40. On the contrary, a Texas district court recently explained that "[t]he government can only convict a defendant of this offense by showing that he *sold guns* at wholesale or retail *for profit* (or to facilitate crimes)." *United States v. Flores*, 652 F.Supp.3d 796, 799 n.14 (S.D. Tex. 2023) (emphasis added); *see also United States v. Strunk*, 551 F. App'x 245, 245-46 (5th Cir. 2014) ("Strunk . . . engaged in a regular course of selling firearms," and "retained money collected on the sale of others' firearms."); *Clark v. Scouffas*, 2000 U.S. Dist. LEXIS 633, at *7-8 (N.D. Ill. Jan. 18, 2000) (applicant not a dealer when he "'sold' only three pistols . . . [f]rom the years 1990 to 1999," and "[n]o profit was made").

## C. The Rule eviscerates the statute's safe harbor provisions.

The statute contains three explicit exceptions—a statutory safe harbor to being "engaged in the business"—for (i) those who make "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection," (ii) those who make "occasional sales, exchanges, or purchases of firearms . . . for a hobby," and (iii) those who "sell all or part of [a] personal collection." 18 U.S.C.

§ 921(a)(21)(C).[6] Notably, each of these plural terms accommodates multiple sales, multiple exchanges, and multiple purchases without rising to the level of "dealing." Indeed, no one could amass a "collection"—another plural word denoting several items—without accumulating multiple firearms, and probably selling some as well. Congress was well aware that "[m]any firearm hobbyists sell or trade firearms from their collections," Senate Report at 8, but never intended for such innocuous conduct to require licensure.

The Rule eliminates these clear protections, conflating them into a single definition of "personal collection" that is defined narrowly to include only "firearms that a person accumulates for study, comparison, exhibition . . . or for a hobby," but "shall not include" "any firearm purchased for . . . financial gain" and "firearms accumulated primarily for personal protection."  89 Fed. Reg. at 29090. This definition conflicts with the statute in numerous ways.

First, by phrasing "personal collection" and "hobby" disjunctively, Congress clearly intended the different terms to mean different things. The Rule, however, combines these distinct exemptions, treating them as redundant. *Id.*; *see Reading Law* at 170 ("a material variation in terms suggests a variation in meaning"), 174 (no word "should needlessly be given an interpretation that causes it to duplicate another provision"). Simply, a "personal collection" must be something different from a

---

[6] The statutory safe harbor is not the only way to conduct firearms transactions without being "engaged in the business." If that were so, then the statute would say that anyone who is not within the safe harbor provisions is required to obtain a license.

"hobby," and the statute protects "occasional sales, exchanges, or purchases" for each.[7]

Second, nothing in the statute suggests the word "collection" should be accorded anything other than its plain meaning: "a number of . . . objects . . . collected . . . according to some unifying principle." ROA.1006. Nothing in the normal understanding of the word "collection" supports the Rule's limitation to specialized activities like scientific research and museum curation. Rather, a collection may be maintained with some unifying theme in mind, for "*some* purpose,"[8] or no purpose at all.[9] The Rule, however, rewrites the statutory safe harbor so that it does not apply to ordinary gun owners and their personal firearms collections.

Third, the safe-harbor provision expressly states that dealing "shall not *include*" anyone who engages in one of three categories of protected conduct. 18 U.S.C. § 921(a)(21)(C). The Rule waters down this unequivocal protection, providing only that a person "shall not *be presumed* to be engaged in the business . . . when reliable evidence shows" certain things. 89 Fed. Reg. at 29092. But the statute requires no

---

[7] Although the district court did not reach the issue, Appellants fail to explain how the Rule's combining of the term "hobby" with the definition of "personal collection" comports with the statute. Congress clearly intended that a person could make occasional purchases and sales "as a hobby" entirely *separate* from occasional purchases and sales "for the enhancement of a personal collection."

[8] *Collection*, *Dictionary.com*, https://tinyurl.com/27jm8xf8 (last visited Nov. 13, 2024) (emphasis added).

[9] *See Hoarders* (A&E 2009).

affirmative evidentiary showing to obtain its protections. And it clearly says, "shall not include," not "shall not be presumed" (but still might be).

Concluding that the Rule "arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision," the district court rejected Appellants' claim that the statutory term "'personal collection' does not include firearms accumulated primarily for personal protection." ROA.1006-07 (rejecting Appellants' claim that the statute "provides *no safe harbor at all* for the majority of gun owners," "two-thirds of [whom] report owning firearms primarily for 'defense' or 'protection'"). Disputing Appellants' claim that the Rule merely adopts the "common meaning" of terms, the district court concluded that "Plaintiffs' reading of the … terminology 'personal collection' is more consonant with 'common meaning'" than Appellants' esoteric definition. ROA.1006.

Rather than contesting that district court's finding that the Rule "provides *no safe harbor at all* for the majority of gun owners" (ROA.1006-07), Appellants embrace the characterization, arguing that it is "unsurprising that Congress did not write the statute to exclude 'the majority of gun owners.'" Appellants' Br. at 43. According to Appellants, it was Congress's deliberate "policy . . . choice" to write the statutory safe harbor narrowly, so that it "does not include firearms 'accumulated primarily for personal protection.'" Appellants' Br. at 41, 44 (maligning the district court for "ignor[ing] the statute Congress wrote"). But Appellants fail to realize that Congress explicitly described "the intent of the Congress" in enacting FOPA, stating clearly that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to .

. . the purpose of . . . *personal protection*." 100 Stat. 449, § 1(b)(2) (emphasis added). In other words, Appellants' remarkable claim is that Congress deliberately wrote Section 921(a)(21)(C)'s safe harbor to exclude firearms acquired for "personal protection," in a statute whose expressly stated goal is guaranteeing that Americans can acquire firearms for "personal protection."[10] Indeed, Congress announced its intent that the statute protects the *very same thing* that Appellants claim it does not reach, using the *very same words* Appellants claim are not included. It certainly was not the district court that "ignore[d] the statute Congress wrote." Appellants' Br. at 44.

Next, Appellants claim that the Rule's narrow definition of "personal collection" finds support in a *separate* definition of a "collector" of "curio or relic" firearms found in Section 921(a)(13). Appellants' Br. at 42. But instead of examining the statutory text, Appellants reference "the relevant regulations" which define "curio or relic" firearms as ones that have "special interest to collectors." *Id.*; *see* 27 C.F.R. § 478.11. For starters, Appellants fail to explain how *regulatory* language adopted by an agency informs the meaning of the *statutory* text enacted by Congress. But even so, all Appellants have done is show that Section 921(a)(13)—unlike Section 921(a)(22)—focuses on a *peculiar* subset of firearms, curios or relics, and those who "collect[]" them. The limitation is on the type of firearm, not the type of collector. If anything, the fact that Section 921(a)(13) applies to a *limited subset* of persons who

---

[10] FOPA's preamble also states that it was enacted to secure "the rights of citizens … to keep and bear arms under the second amendment." As the Supreme Court has since explained, the Second Amendment's "core lawful purpose [is] self-defense" (*i.e.*, personal protection). *Heller*, 554 U.S. at 630.

collect a *specific type* of firearm undermines Appellants' position, implying that Section 921(a)(21)(C) was meant to sweep far more broadly.[11]

Appellants again claim that the caselaw supports them (at 42), but their cases miss the mark. The Third Circuit's decision in *Tyson* has nothing to do with the Section 921(a)(21)(C) statutory safe harbor for a "personal collection." Rather, the defendant in that case "said 'that he was an antique gun buyer and collector' . . . presumably because he knew that 'antique' firearms are exempted *from the trafficking statute*." *Tyson*, 653 F.3d at 202 (emphasis added). And *United States v. Idarecis*, 1998 U.S. App. LEXIS 25991 (2d Cir. Oct. 9, 1998), an unpublished decision, involved a "plain error" review of a "novel claim" that was "not raised below," where the court found that the absence of legal authority on the difference between "collector" and "collection" meant that the district court could not have committed plain error. *Id.* at *10-11. *Idarecis* certainly does not contain any analysis supportive of the Rule.

Finally, Appellants theorize that, even if the Rule does eviscerate the statutory safe harbor, some sales of "personal protection" firearms still *might* be permissible under the statute. Appellants' Br. at 44 (even though "personal protection" firearms

---

[11] Appellants note that the Rule constrains a "personal collection" so that it "does not include firearms that have no *special interest to the collector*," thereby mirroring the definition of "curio or relic" firearms which "are of *special interest to collectors*." Appellants' Br. at 42. Appellants understand Section 921(a)(21)(C)'s safe harbor to protect only "curio or relic" firearms. Appellants provide no authority for this statutory mutilation. Had Congress intended Section 921(a)(21)(C) to apply only to a certain kind of firearms, then it would have used the same "firearms *as curios or relics*" phrasing found in Section 921(a)(13). Because Congress did not, a "material variation in terms suggests a variation in meaning." *Reading Law* at 170.

are not "within the personal collection exclusion . . . that does not mean that sales of such firearms automatically require a license"). But whereas the statute says that certain conduct *is per se lawful*, Appellants demur that the same conduct *may not be unlawful*. Of course, "there is a massive difference between being *declared not* in violation of federal law (*i.e.*, the statute) . . . versus *not being presumed* in violation of federal law (what the [Rule] says)." Ex. A at 47-48, ECF No. 16-1. The Rule's equivocating "maybe, maybe not" standard is a far cry from the statute's definitive protection.

## D. The Rule's presumptions flip the statutory burden of proof, presuming perfectly innocuous conduct to be evidence of criminal activity.

The Rule "creates sets of presumptions" which are "highly problematic" because they "requir[e] that firearm owners prove innocence rather than the government prove guilt." ROA.1007; *see also* 89 Fed. Reg. at 29091-92 (creating five presumptions that a person is "engaged in the business," seven presumptions that a person is intending to "predominantly earn a profit," and six categories of "conduct that does not support a presumption"). Despite acknowledging that the question whether someone is "engaged in the business" is a "fact-specific inquiry," 89 Fed. Reg. at 29091, the Rule distills the fact-specific case law it cites down to *single factors*, whose sole satisfaction is used to presume satisfaction of *all elements* of the statute. 89 Fed. Reg. at 29024. *Cf. United States v. Brenner*, 481 F. App'x 124, 127 (5th Cir. 2012) (per curiam) (emphasis added) (Section 921(a)(21) requires "examin[ation of] *all circumstances* . . . without the aid of a 'bright-line rule'"), *with Chem. Mfrs. Ass'n*

*v. DOT*, 105 F.3d 702, 705 (D.C. Cir. 1997) (presumptions only "appropriate when *proof of one fact* renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of [the inferred] fact . . . until the adversary disproves it" (emphasis added) (quotations marks omitted)). And, while promising that these presumptions "shall not apply to any criminal case," a point it "reiterates no less than 10 times" (at 45), the Rule simultaneously posits that its presumptions nonetheless "may be useful to courts in criminal cases," 89 Fed. Reg. at 29092. Thus, in a single breath the Rule encourages courts to do the very thing the Rule promises will not occur.

Of course, Congress never authorized ATF to create such regulatory shortcuts. *See* 18 U.S.C. § 926(a) (authorizing only "necessary" regulations). Something is "necessary" if it is "absolutely needed: required" or "compulsory."[12] Instead, Appellants merely posit that their "presumptions" will "*help*[] to promote compliance with . . . licensing requirements." Appellants' Br. at 48 (emphasis added). But 'helpfulness' is not 'necessity.' Appellants hardly can claim that the Rule's "presumptions" suddenly are "required" to "carry out" enforcement of a statute that has been enforced for decades without them. *See* Commerce in Firearms and Ammunition, 53 Fed. Reg. 10480, 10481 (Mar. 31, 1988) (ATF previously refusing to give "engaged in the business" examples because the statute "expressly delineat[es] the activity requiring licensing. . . .").

---

[12] *Necessary*, *Merriam-Webster*, https://tinyurl.com/mr4cdcnz (last visited Nov. 13, 2024).

Nor is Congress a stranger to creating presumptions when it wants to. *See, e.g.*, 18 U.S.C. §§ 1469(a), 3142(e)(2); 35 U.S.C. § 282(a); 38 U.S.C. § 1118. In fact, Congress created a rebuttable presumption within the very same statutory scheme where Appellants claim the authority to create more. *See* 18 U.S.C. § 922(b)(3) (licensee "shall be presumed . . . in the absence of evidence to the contrary, to have had actual knowledge of [state law]"). Perhaps even more tellingly, 18 U.S.C. § 1466 uses the very same term "engaged in the business" with respect to selling "obscene matter," where Congress created a "*rebuttable presumption*" whenever certain quantities of materials are made available. Had Congress desired to create a similar presumption in Section 921, it could have. But courts "do not read Congress' silence as an invitation to graft onto the statute an otherwise absent" provision. *Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 442 (5th Cir. 2022).

It is hardly surprising that the district court found fault with the Rule's presumptions, explaining that they "flip the statute on its head" and "conflict with the statutory text." ROA.1007. Rejecting Appellants' dismissive references to ATF's "knowledge of existing case law" and "subject matter expertise," the district court declined Appellants' invitation to "just trust us." ROA.1008.

Now on appeal, Appellants claim that "the Rule looks to 'conduct that the courts have found to require a license'" (at 45), overlooking yet again that many of those authorities are pre-FOPA cases and their progeny which advance now-repudiated judicial standards. *See, e.g.*, 89 Fed. Reg at 28982 n.100 (citing *King*). In other words, the Rule's presumptions are wrong largely for the same reasons explained.

Next, Appellants claim a broad authority to enact any sort of presumptions they wish, demurring that "such presumptions are not uncommon" in other contexts. Appellants' Br. at 46 (citing an Eleventh Circuit case for the idea that "presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts"). But this Court recently used no such test in *Career Colleges & Schools of Texas v. U.S. Department of Education*. Rather, that rule, like this one, involved "decisions [that] are highly fact-specific" and therefore "too discrete to justify a universal presumption." *Id.* at 250; *cf.* 89 Fed. Reg. at 29091 ("Whether a person is engaged in the business . . . is a fact-specific inquiry."). Accordingly, "[t]he Department's attempt to substitute its unexplained 'experience' . . . justifying the presumptions is arbitrary and capricious." *Career Colls.*, 98 F.4th at 250-51; *see also El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023). *Cf.* 89 Fed. Reg. at 28975 (invoking "enforcement efforts, regulatory functions, knowledge of existing case law, and subject-matter expertise").

Appellants proceed with the incredible claim that "the district court—like plaintiffs—largely has not questioned the substance of the presumptions." Appellants' Br. at 47. Apparently, Appellants missed the district court's conclusion that "several presumptions conflict with the statutory text," ROA.1007, along with Plaintiffs' specific challenges to many of the presumptions. *See* ROA.161-65 (detailing how each set of presumptions conflicts with the statute). How all of this fails to "question[] *the substance* of the presumptions" is anyone's guess. Appellants' Br. at 47. Unlike the statute, EIB presumption 1 requires no actual sales or purchases—just "offers" and "willingness." 89 Fed. Reg. at 29091. EIB presumption 2 allows "purchases" *or*

36

"res[ale]s," whereas the statute requires both. *Id.* And focusing only on "res[ale]s," EIB presumptions 3, 4, and 5 are entirely detached from the statutory requirement that there be repeated "purchases." *Id.* Likewise, the Rule's PEP presumptions each assume that certain forms of behavior or activity constitute an unlawful *intent* to earn a profit (unless proven otherwise). But ATF fails to recognize that the statute requires *actual* profit from *actual* purchases and resales, *and* that the intent underlying that profit come from an impermissible motivation.

### E. The rule is unlawful and unconstitutional on numerous other grounds the district court did not reach.

The district court provided numerous examples of how the Rule conflicts with the statute and therefore is unlawful. Each is sufficient reason to affirm. That said, Appellees raised numerous additional claims and arguments below showing the Rule to be both unlawful and unconstitutional, which the district court did not find it necessary to reach. Briefly summarized below, these additional arguments further support affirmance.

#### 1. ATF cannot redefine that which Congress has already defined.

It is black-letter law that ATF has no authority to redefine terms which Congress *already* has defined. Indeed, "[t]he statute's unambiguous . . . definition . . . precludes the [agency] from more expansively interpreting that term." *Digit Realty Tr., Inc. v. Somers*, 583 U.S. 149, 169 (2018); *see also Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition. . . ."). In spite of these clear proscriptions, the Rule defines several terms, including "dealer," "engaged in the business," and "to predominantly earn a

profit." Because the statutory definitions for these terms already exist, those statutory definitions control.

### 2.    ATF cannot define simple, unambiguous statutory terms.

As this Court observed, "[t]he task of statutory interpretation begins and, if possible, ends with the language of the statute." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486-87 (5th Cir. 2013). And "[w]hen the words of a statute are unambiguous, then, th[e] first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). The Rule nonetheless seeks to create and then resolve ambiguity where none exists, excising simple, ordinary words like "purchase" and "sale" and defining them "consistent with the[ir] *common meaning.*" *See* Proposed Rule, 88 Fed. Reg. at 61999 nn.44, 45 (2023) (emphasis added). But ATF does not allege that any ambiguity exists in these terms or explain why ordinary people cannot understand them. Worse still, ATF's attempt to define simple words often backfires spectacularly. For example, starting with the easily understood word "sale," defining it to include "something of value," defining *that* to include "valuable consideration," and then defining *that* to include "forbearance," 89 Fed. Reg. at 28975 n.56, a word that likely is not easily comprehended by many. This is a pattern within the Rule—start with a simple term and redefine it until it is clear as mud.

### 3.   The Rule creates extra-statutory terms.

The GCA distinguishes between two types of individuals: "licensed dealers," and those who are not.[13] There is no middle ground. Nowhere did Congress contemplate—much less create—licensure for so-called "former licensees." ATF previously described as much to the general public, noting in an industry circular that FFLs who continue to sell firearms after the revocation, expiration, or surrender of their license are subject to the same rules as those who have never been licensed. Rejecting that position, the Rule creates the extra-statutory term "former licensee inventory" to describe firearms "that were in the business inventory of a licensee at the time the license was terminated," 89 Fed. Reg. at 29090, before purporting to establish rules governing the disposition of such firearms and "presumptions" applying only to "former licensees," 89 Fed. Reg. at 29090-91. None of this comports with the statute. To expand a penal law to reach previously uncovered persons and conduct requires something more than executive fiat. *See Reading Law* at 93.[14]

### 4.   Lenity demands resolution of any lingering ambiguity in favor of Appellees.

If this Court finds any part of the statute ambiguous after utilizing "all available tools of statutory interpretation," then the rule of lenity applies. *Cargill v. Garland*,

---

[13] *See, e.g.*, 18 U.S.C. § 923(c) ("licensed . . . dealer" and "licensee"); 18 U.S.C. § 922(a)(1)(A) ("any person except a . . . licensed dealer").

[14] For one GOA member, such inventory "largely constitutes their retirement," ROA.75, and, at least as of the date Plaintiffs filed their complaint, was "now frozen" and "unsellable." ROA.1000. Another GOA member was unsuccessfully prosecuted under this theory. ROA.77-78.

57 F.4th 447, 470, 469 (5th Cir. 2023) (en banc), *aff'd sub nom.*, 602 U.S. 406 (2024); *see also Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (a court "must exhaust all the 'traditional tools' of construction" and "[o]nly when that legal toolkit is empty" may alternative approaches be considered) (citation omitted). Demanding resolution of ambiguity against the government, lenity thus "upholds due process by safeguarding individual liberty in the face of ambiguous laws," and "fortifies the separation of powers." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2286 (2024) (Gorsuch, J., concurring).

Plaintiffs believe the statute is clear—purchases, sales, and profit are required. The plain text demonstrates these realities in nearly a dozen ways, and the statute's preamble confirms it. Nevertheless, the Rule imposes licensure on those that the text does not. *See* 89 Fed. Reg. at 29091 (establishing presumptions of required licensure in myriad contexts); 89 Fed. Reg. at 29092 (reducing explicit statutory safe harbors to "rebuttal evidence" for use against its presumptions). To the extent that ATF's erroneous constructions of the statute are even to be entertained, all that would mean is that the statute has more than one possible meaning. And "we construe ambiguous statutes against imposing criminal liability—precisely what ATF has done here." *VanDerStok v. Garland*, 86 F.4th 179, 196 n.26 (5th Cir. 2023).

### 5. The Rule violates Appellees' constitutional rights.

Courts "generally construe statutes in a way that avoids, rather than invites, constitutional infirmity." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 943 (5th Cir. 2024). The Rule's numerous constitutional defects only further confirm that Appellants' reading of the statute is untenable.

### a.   The Rule violates the Second Amendment.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively extends to all locations, and presumptively covers all "lawful purposes." *Heller*, 554 U.S. at 581, 582, 624; *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 32 (2022). It is beyond question that the Second Amendment protects Plaintiffs' "proposed course of conduct." *Bruen*, 597 U.S. at 32. Plaintiffs are members of "the people" who own, use, and at times purchase and privately sell firearms. *Id.*; ROA.20-22. By axiom, it would be impossible to "keep . . . Arms," much less "bear" them, unless the Second Amendment protected threshold acts like purchase and sale—natural prerequisites to exercising the right. Thus, the government must show that the Founders sought to license *private, noncommercial* sellers who occasionally sold and traded personal firearms. No such tradition has ever existed.

### b.   The Rule Violates the Fourth Amendment.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Thus, warrantless searches "are *per se* unreasonable . . . ." *Katz v. United States*, 389 U.S. 347, 357 (1967). Requiring (at least) tens of thousands of gun owners to seek federal licensure, the Rule subjects each new licensee to warrantless ATF inspections of their private homes and personal gun collections. 27 C.F.R. § 478.23(b); ROA.54. This massive expansion of ATF's powers simply cannot be

justified under the *limited* "highly regulated industry" exception to the warrant requirement, a regime whose purported constitutionality derives from its narrow application. Indeed, it "has always been a narrow exception" that cannot "swallow the Rule." *City of Los Angeles v. Patel*, 576 U.S. 409, 424-25 (2015). It seems unlikely that a rule which applies to places like mines and junkyards was ever intended to apply within the home. Moreover, the continuing validity of this exception is highly suspect after *Bruen*, even with respect to traditional firearm dealers, because the Supreme Court admitted in *United States v. Biswell*, 406 U.S. 311, 315 (1972), that "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control" of other traditionally regulated industries—*i.e.*, the very thing *Bruen* requires.

### c.    The Rule is void for vagueness.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Due Process Clause requires that criminal laws "give ordinary people fair warning about what the law demands of them." *United States v. Davis*, 588 U.S. 445, 448 (2019). The Rule cannot meet this basic standard. For example, under the Rule, the safe-harbor protection depends on whether a particular gun was owned for "personal protection" as opposed to for "a hobby" or for "study." 89 Fed. Reg. at 29090. How one is supposed to navigate between these two extremes—especially when people have multiple reasons for owning firearms—the Rule does not say. The Rule's "presumptions" only muddy the waters even further. The Rule creates a cornucopia of "not exhaustive" "presumptions" that "may" apply (or may not) to certain activities, which may (or may

not) show that a person is engaged in the business, and which must be overcome by a showing of "reliable evidence to the contrary," whatever that means. 89 Fed. Reg. at 29091-92. How such indeterminate language can place the public on notice of what individuals can and cannot do—especially considering the warning that *more* "may be considered" behind closed doors—Appellants never explain. 89 Fed. Reg. at 29092. The Rule's presumptions therefore invite quintessential "arbitrary and discriminatory enforcement" in violation of due process. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

### d.   The Rule violates the separation of powers.

Article I, § 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Article I, § 7, cl. 2, in turn, mandates that "[e]very Bill . . . shall have passed the House of Representatives and the Senate" and "shall, before it become a Law . . . be presented to the President of the United States." Together ensuring a separation of powers, these provisions ensure that "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *Davis*, 588 U.S. at 447-48.

In violation of this doctrine, the Rule openly admits that its regulatory changes are not just "in light of the BSCA's changes" but also "to provide *additional* guidance," beyond any statutory grant of authority, because "*advancements* in manufacturing . . . and distribution technology . . . and *changes* in the marketplace for firearms . . . have *created a need for further clarity* in the regulatory definition of 'dealer.'" 89 Fed. Reg. at 28973 (emphases added). But "Congress alone has the institutional

competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

## III. Equitable Factors Support Preliminary Injunctive Relief.

Asserting in conclusory fashion that "plaintiffs face no cognizable injury at all," Appellants' Br. at 48, Appellants claim that "there is no prospect of *criminal* enforcement of the Rule at all." *Id.* at 47. On the contrary, ATF *has already enforced* its unlawful theories against one of Plaintiffs' members, ROA.998-99, and appears to be enforcing the Rule against others. ROA.817. Indeed, Tormey and other members of the organizational Plaintiffs "face both civil and criminal enforcement actions for engaging in conduct that the BSCA permits but the Final Rule impermissibly forbids." ROA.1009. Appellants claim that the Rule "tracks the statutory framework" and "does not create any new licensing requirements." Appellants' Br. at 47-48. But the Rule very much expands who must be licensed. As the district court explained, not only are the Plaintiff States likely to suffer "revenue loss" due to lost sales from law-abiding gun sellers who the Rule threatens with prosecution, but also Plaintiffs' members and supporters "cannot collect" and cannot "dispose of firearms" without being presumed engaged in felonious behavior. ROA.1009 (also noting the unrecoverable "monetary costs" of those "seeking licensure" under the Rule). Other than to broadly note their objection, Appellants do not engage with the specifics of (or even really contest) the district court's findings.

In equally conclusory fashion, Appellants then claim that "[t]he government . . . has a strong interest in continuing to enforce the Rule," vaguely invoking the platitude of "prevent[ing] violent crime." Appellants' Br. at 48. But Appellants never explain *how* maintaining the status quo (which has existed for decades) will lead to "violent crime." And as for any alleged "significant noncompliance with the licensing requirements," *id.*, that reflects nothing more than the agency's gross misinterpretation of the statute it seeks to enforce.

## IV. The District Court's Preliminary Relief Is Not Overbroad.

Asserting that the district court should have limited its relief "to the provisions or aspects held likely unlawful," Appellants note that the Rule contains a severability clause. Appellants' Br. at 49. Still, before severing provisions, the Court must consider (i) whether the agency would have adopted the remainder of the rule without the struck provisions, and (ii) whether the remainder of the rule can "function sensibly." *See Texas v. United States*, 691 F. Supp. 3d 763, 788 (5th Cir. 2023).

Claiming that the district court "only address[ed] three definitions and two presumptions," Appellants assert that "numerous other definitions and regulatory changes" should "continue to function." Appellants' Br. at 49. But this misrepresents the district court's actual decision, which rejected the Rule's "sets of presumptions" on their face as "highly problematic" because they "flip the statute on its head." ROA.1007 (alternatively finding that "several presumptions conflict with the statutory text"). The court also broadly rejected the Rule's presumptions because they are based on "'Department *ipse dixit*.'" ROA.1008. Generally, the district court determined that the Rule "clashes with the text." ROA.1004.

Appellants are also short on specifics. They fail to identify any particular provision of the Rule that they believe can be severed from the rest of the text. *See Texas*, 691 F.Supp.3d at 789 ("the Court is perplexed as to why [the agency] feels that this Court should try to tailor the Final Rule when the agency made no attempt to do so."). Appellees submit that the district court—in a merits decision—is the best place to determine if any portion of the Rule might be saved if keystone provisions are struck. Unlike in *VanDerStok*, 86 F.4th at 186, where the plaintiffs challenged only "two portions of the Final Rule," here Plaintiffs challenged virtually every part of the Rule. *Cf.* Appellants' Br. at 50 (seeking to salvage the terms "dealer," "purchase," and "former licensee inventory"), *with* ROA.149-50 (challenging Rule's definition of "dealer"), 150-61 ("purchase" and "sale"), 165-67 ("former licensee inventory"). Thus, the district court's preliminarily enjoining the entire Rule (and its numerous intertwined definitions) was appropriate.

## Conclusion

The Court should affirm the preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Aaron L. Nielson
Solicitor General

Brent Webster
First Assistant Attorney General

Lanora C. Pettit
Principal Deputy Solicitor General

/s/ Kateland R. Jackson
Kateland R. Jackson
Assistant Solicitor General
Kateland.Jackson@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Liz Murrill
Attorney General of Louisiana

Office of the Attorney General
1885 N. 3rd Street
Baton Rouge, Louisiana 70802
Tel.: (225) 326-6079

Lynn Fitch
Attorney General of Mississippi
Mississippi Attorney General's
    Office
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680

/s/ Andrew Dymek
(signed with consent)
Andrew Dymek
Assistant Utah Solicitor General
Office of the Utah Attorney General
P.O. Box 142320
Salt Lake City, Utah 84114-2320
Tel.: (801) 366-0533
adymek@agutah.gov

*Counsel for Plaintiff-Appellee*
*State of Utah*

/s/ Robert J. Olson
Robert J. Olson
William J. Olson, PC

Eric S. Abels
Assistant Attorney General

*Counsel for State of Texas*
*Plaintiff – Appellee*

/s/ J. Benjamin Aguiñaga
J. Benjamin Aguiñaga
Solicitor General
AguinagaB@ag.louisiana.gov

*Counsel for Plaintiff-Appellee*
*State of Louisiana*

/s/ Justin L. Matheny
Justin L. Matheny
Deputy Solicitor General
justin.matheny@ago.ms.gov

*Counsel for Plaintiff-Appellee*
*State of Mississippi*

370 Maple Ave. W., Ste. 4
Vienna, VA 22180
rob@wjopc.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
stephen@sdslaw.us

John I. Harris III
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, TN 37203
jharris@slblawfirm.com

Oliver M. Krawczyk
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
oliver@amblerlawoffices.com

*Counsel for Plaintiffs-Appellees Jeffrey W. Tormey, Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, and Virginia Citizens Defense League*

## CERTIFICATE OF SERVICE

On November 18, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kateland R. Jackson
KATELAND R. JACKSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,518 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kateland R. Jackson
KATELAND R. JACKSON